

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-30-2004

# CA Pub Empl Ret Sys v. Chubb Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-3755

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

## Recommended Citation

"CA Pub Empl Ret Sys v. Chubb Corp" (2004). *2004 Decisions.* Paper 2.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/2

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-3755

———

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, on behalf of itself and all others similarly situated;
NEW YORK STATE COMMON RETIREMENT FUND;
*THE BUTLER WICK TRUST COMPANY, THE
EXECUTOR OF THE ESTATE OF JOHN N. TEEPLE,
DECEASED,

Appellants

v.

THE CHUBB CORPORATION; DEAN R. O'HARE; DAVID
B. KELSO; HENRY B. SCHRAM; EXECUTIVE RISK INC.;
STEPHEN J. SILLS; ROBERT H. KULLAS;
ROBERT V. DEUTSCH

*Pursuant to the Court's Order of 10/5/04

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 00-cv-04285)
District Judge: Hon. Garrett E. Brown, Jr.

———

Argued October 7, 2004

BEFORE: SLOVITER, VAN ANTWERPEN and COWEN,
Circuit Judges

(Filed   December 30, 2004 )

———

William S. Lerach, Esq.
Eric A. Isaacson, Esq. (Argued)
Lerach, Coughlin, Stoia, Geller,
  Rudman & Robbins
401 B Street
Suite 1700
San Diego, CA 92101

Counsel for Appellants

Herbert Wachtell, Esq. (Argued)
Jonathan E. Pickhardt, Esq.
John F. Savarese, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

Mary C. Roper, Esq.
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square
Philadelphia, PA 19103

Counsel for Appellees The Chubb Corporation;
Dean R. O'Hare; David B. Kelso;
Henry B. Schram; Executive Risk Inc.

William J. O'Shaughnessy, Esq. (Argued)
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, NJ 07102-0652

Counsel for Appellees Stephen J. Sills;
Robert H. Kullas; Robert V. Deutsch

COWEN, Circuit Judge

     This is a securities class action lawsuit brought on behalf of shareholders of the Chubb Corporation ("Chubb") against Chubb, Executive Risk, Inc. ("Executive Risk"), and several Chubb and Executive Risk officers. Plaintiffs aver that Defendants defrauded investors by artificially inflating the value of Chubb's common stock through accounting manipulations and false statements designed to effectuate a stock-for-stock merger between Chubb and Executive Risk, and avoid an alleged hostile takeover attempt. The District Court granted Defendants' motion to dismiss Plaintiffs' Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4 *et seq.*, and Fed. R. Civ. P. 9(b), and denied Plaintiffs leave to file a Third Amended Complaint. We will affirm.

I.

A.

     In reviewing the factual background of this litigation, we accept as true the well-pleaded allegations in the Second Amended Complaint and consider the documents incorporated by reference therein. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420, 1426 (3d Cir. 1997).

*Background to Class Period*

     Plaintiffs are investors who acquired Chubb common stock between April 27, 1999 and October 15, 1999 (the "Class Period"), including the former shareholders of Executive Risk who exchanged their Executive Risk shares for shares of Chubb stock pursuant to a merger of the companies that occurred on July 20, 1999. The Defendants are Chubb, Executive Risk, and their top former corporate officers, Chubb Chief Executive Officer ("CEO") Dean R. O'Hare, Chief Financial Officer

("CFO") David B. Kelso, Chief Accounting Officer Henry B. Schram, and Executive Risk CEO Stephen J. Sills, Board Chairman Robert H. Kullas, and CFO Robert V. Deutsch.

Chubb is a diversified insurance company headquartered in Warren, New Jersey, with local branch and service offices throughout North America and internationally. Chubb sells personal, standard commercial and specialty commercial insurance and is one of the largest national underwriters of directors' and officers' liability insurance. The claims in this securities class action concern Chubb's standard commercial insurance business, which accounts for approximately one-third of Chubb's total premiums.

Beginning in 1995 and continuing through 1998, Chubb's financial performance deteriorated. Chubb consistently cited the competitive standard commercial insurance market as the cause of its poor performance during this period. On February 2, 1999, Chubb reported disappointing fourth quarter 1998 and year-end results. Defendant O'Hare assured investors that "[w]e are taking aggressive steps to achieve adequate prices for this business, and we expect to see the impact of these actions as we move through the renewal cycle." (Compl. ¶ 17.)

O'Hare employed two strategies to address Chubb's flagging business. First, to combat the continuing diminution of Chubb's stock price and earnings-per-share ("EPS") in the latter half of 1998, O'Hare promulgated what Plaintiffs refer to as the "rate increase/policy non-renewal initiative" (hereinafter referred to as the "rate initiative"). Announced in October 1998 following the release of disappointing third quarter 1998 results, the rate initiative sought to revamp the standard commercial insurance operations by increasing premiums and refusing to renew unprofitable business. Second, in an effort to counter the difficulties in the standard commercial business and increase profitability, Chubb sought to acquire a profitable specialty insurance company. Accordingly, in 1998, Chubb targeted Executive Risk, a profitable insurance carrier specializing in directors' and officers' liability insurance, for acquisition. On February 6, 1999, following negotiations which took place

4

between October and December 1998 and due diligence investigations conducted in January 1999, Defendants O'Hare and Sills publicly announced the merger agreement. The terms included a stock-for-stock acquisition at a fixed exchange ratio of 1.235 Chubb shares to each share of Executive Risk stock. On February 5, 1999, the agreed-to-ratio represented a premium of 63%, as Chubb stock was valued at $58 1/16 and Executive Risk stock was valued at $44. In addition, Plaintiffs contend that Executive Risk's Board members, including Sills, Kullas, and Deutsch, were given special benefits and payments for endorsing the transaction to Executive Risk shareholders. Final approval of the merger was subject to a vote of Executive Risk's shareholders.

Plaintiffs claim that the impending Executive Risk shareholder vote and fixed exchange ratio placed tremendous pressure on Chubb, O'Hare, Kelso, and Schram to halt the decline of Chubb's stock price,[1] because any further decline would result in less consideration for Executive Risk shareholders and thereby jeopardize the merger vote. As such, Plaintiffs allege that the Chubb Defendants issued false and misleading statements representing that the rate initiative was ameliorating the problems in the standard commercial lines business, and that it was doing so more quickly than anticipated. This, Plaintiffs allege, artificially inflated the value of Chubb's stock and portrayed the merger as more beneficial to Executive Risk shareholders than it truly was. Plaintiffs also claim that the Chubb Defendants were motivated to continue to artificially inflate the price of Chubb's stock following consummation of the acquisition because Chubb was threatened with a hostile takeover.

*False Statements and False Financial Results: First Quarter 1999*

---

[1]Notably, however, immediately prior to the release of Chubb's first quarter 1999 results on April 27, 1999, Chubb's share price closed at $58 1/16, the same price at which it had closed on February 5, 1999, the day before the announcement of the Executive Risk merger.

According to Plaintiffs, Defendants' allegedly fraudulent scheme to inflate the value of Chubb's stock began with the release of Chubb's first quarter 1999 results via a press release issued on April 27, 1999.

The first quarter 1999 results were better than expected, revealing an improved EPS and a combined ratio[2] of 117.9% in the standard commercial insurance lines, down from 119.5% in the fourth quarter 1998 report. Plaintiffs claim that the Chubb Defendants intentionally falsified these results, including the calculation of the combined ratio, by violating generally accepted accounting principles ("GAAP") and SEC rules. In addition, Plaintiffs allege that in the days and weeks following the release of the first quarter 1999 results, the Chubb Defendants promulgated numerous statements falsely attributing the favorable first quarter 1999 results to the success of the rate initiative in turning around the standard commercial lines and forecasting even further improvement.

Plaintiffs assert that statements contained in Chubb's April 27, 1999 press release were false, as were statements made by individual Chubb Defendants in follow-up conversations and conference calls with analysts and investors. Chubb's April 27, 1999 press release stated that

> [O]ur pricing strategy in standard commercial lines has begun to show the impact we are looking for in our renewal business. Month by month, renewal rate increases are building momentum, and we expect this trend to continue. Moreover, we have been successful in retaining business we want to keep at higher rates, while at the same time we are walking away from business where we can't obtain adequate pricing. By maintaining this profit oriented discipline, standard commercial lines will likely show a decline in premiums throughout the

---

[2]The "combined ratio" compares the incurred losses plus operating expenses of an insurance business to its total earned premiums. A ratio over 100% generally indicates an underwriting loss.

year and produce improved combined ratios. This decline in premiums should be offset by continued premium growth in personal and specialty commercial lines and by the benefits of a series of growth initiatives begun late last year.

It also represented that Chubb's standard commercial insurance combined ratio was 117.9%, down from the fourth quarter 1998 combined ratio of 119.5%. Plaintiffs claim that in a follow-up conference call held on April 27, 1999, and in follow-up conversations with individual analysts, money and portfolio managers, institutional investors and large Chubb shareholders, Defendants O'Hare and Schram maintained that

(a) the rate initiative was not only working, but was actually exceeding management's expectations, and this accounted in large part for Chubb's better-than-expected first quarter 1999 results;

(b) as a result of the successful turnaround of Chubb's standard commercial insurance operations, that part of Chubb's business would show 5 1/2% to 6% premium growth throughout 1999, as Chubb's rate increases for new or renewal standard commercial insurance policies were sticking;

(c) the momentum of rate increases in Chubb's standard commercial insurance operations was growing month by month;

(d) Chubb was successful at retaining the higher priced standard commercial insurance rate which it desired and was profitable;

(e) although Chubb was prepared to lose between $250 and $300 million in standard commercial insurance business, as this would make that business more profitable, Chubb was not losing as much of its standard commercial insurance business due to rate increases as it had feared; and

(f) the combined ratio of Chubb's standard commercial insurance business would decline throughout 1999, to about 110% by year-end from 119.5% at year-end 1998, ultimately

7

producing an underwriting profit by 2000.

Furthermore, according to Plaintiffs, O'Hare stated that "[y]ou guys are so bloody negative it's disgusting. We're trying to send a strong signal to you that things are getting better. I don't know how else to say it . . . This god dam [sic] ship has turned faster than I thought it was going to." (Compl. ¶ 38.)

The individual Chubb Defendants repeated these statements several times, including in private conversations with various analysts subsequent to the April 27, 1999 conference call, and during the 1999 Annual Chubb Shareholders' Meeting on April 27, 1999. Moreover, the Chubb Defendants informed analysts of Chubb's decision to increase its forecasted 1999 EPS to $4.10+ and its 2000 EPS to $4.50+ because of the better-than-expected pace of the turnaround of Chubb's standard commercial insurance business.

On May 12, 1999 in a private meeting with securities analysts, institutional investors and money managers in Boston, Defendant O'Hare allegedly maintained that premium rates were rising in the standard commercial lines and forecasted a 1999 EPS of $4.28 and a 2000 EPS of $4.70.

Chubb's Form 10-Q Report for first quarter 1999, signed by Schram and filed with the SEC on May 14, 1999, provided that total premiums had decreased by 3.9% in the standard commercial lines as a result of the rate initiative, but that on renewed business "rates increased moderately in the first quarter of 1999 and we expect this trend to continue." (*Id.* ¶ 51.)

In a June 2, 1999 conference attended by Chubb shareholders, securities analysts, institutional investors and money managers, O'Hare reiterated in a speech and in follow-up private conversations his optimistic assessments of Chubb's standard commercial lines and his forecasts for improved EPS, combined ratio, and premium growth throughout 1999. He further predicted that "the standard commercial insurance business would produce an underwriting profit by the year 2000 and a 6% total return on equity by 2001." (*Id.* ¶ 52.)

8

On June 15, 1999, at a luncheon with several securities analysts O'Hare expressed that he was "more optimistic than usual" and added that Chubb would realize a 6% return on equity in the standard commercial lines by late 2000. Based upon a June 25, 1999 meeting between O'Hare and an analyst from Bear Stearns, Bear Stearns reported O'Hare's statement "that the company's repricing/underwriting project in the standard commercial lines . . . continues to make progress" and "the decline in retentions appears to have bottomed, and management expects these figures to begin to move higher." (*Id*. ¶ 61.)

Plaintiffs contend that the falsified first quarter 1999 results and the Chubb Defendants' subsequent representations immediately caused the value of Chubb stock to rise.[3]

*The Executive Risk / Chubb Registration Statement and Merger Proxy Statement*

On June 17, 1999, Chubb and Executive Risk filed with the SEC the Registration Statement and Merger Proxy related to the proposed merger. The individual Chubb Defendants signed the Registration Statement, and the individual Executive Risk Defendants wrote the Merger Proxy.

The Merger Proxy was mailed to Executive Risk shareholders on June 18, 1999. The Merger Proxy unanimously recommended approval of the merger to the company's shareholders and concluded that "the merger is in the best interests of Executive Risk and its shareholders." The Merger Proxy also incorporated the opinions of certain securities analysts that "the merger consideration is fair to Executive Risk stockholders from a financial point of view." The Merger Proxy included Chubb's first quarter 1999 results by reference to Chubb's first quarter 1999 Form 10-Q statement, and it detailed the climb in Chubb stock value between February 5, 1999 and June 15, 1999.

---

[3]Chubb stock traded at $57 per share on April 26, 1999, $70 5/16 per share on May 7, 1999, $76 3/8 per share on May 14, 1999 (the Class Period high) and closed at $70 9/16 on June 15, 1999.

Plaintiffs allege that the representations contained in the Registration Statement and Merger Proxy were false and misleading because they were based upon Chubb's falsified first quarter 1999 results, the Chubb Defendants' false statements regarding the standard commercial insurance business made thereto, and the artificially inflated price of Chubb stock. Plaintiffs further assert that the Executive Risk Defendants recommended the merger to the shareholders in exchange for, *inter alia*, millions of dollars in special benefits from Chubb.

Executive Risk's shareholders approved the merger on July 19, 1999, and it was executed the following day. Anticipating the release of lower-than-forecast second quarter 1999 results, Chubb's stock price began to fall immediately thereafter.

*False Statements and False Financial Results: Second Quarter 1999*

On July 27, 1999, approximately one week following consummation of the merger, Chubb released its second quarter 1999 results. The second quarter had closed on June 30, 1999. Plaintiffs allege that the EPS of $1.00 per share and reported combined ratio of 120.8% were "well below expected results." (Compl. ¶ 64.) Although O'Hare admitted that he had previously been "overly optimistic at the end of the first quarter" regarding turnaround of the standard commercial lines, Plaintiffs contend that the second quarter 1999 results were false and misleading, and that the Chubb Defendants continued to conceal the true extent of the rate initiative's failure with purportedly false and misleading statements.

Chubb's July 27, 1999 press release provided, in part:

> Standard commercial lines premiums in the second quarter declined 9% to $455.4 million and had a combined ratio of 120.8%. "We made continued progress in improving pricing in our standard commercial lines during the quarter," said Mr. O'Hare. "Our pricing initiative is building momentum, with rates on renewal

10

business continuing to accelerate.  We have retained business we want to keep at more attractive rates, while walking away from unprofitable or under-priced renewals . . . ."

"Given the moderate magnitude of rate increases in the early stages of the repricing program," said Mr. O'Hare, "it will take at least two renewal cycles to adequately reprice the entire standard commercial book, and during that time we will continue to have losses from non-renewed policies.  Thus . . . it will be mid-2000 before the benefits of these actions significantly flow to the bottom line."

(*Id*.) In a follow-up conference call and in subsequent conversations with analysts, O'Hare and Kelso allegedly stated:

(a) Management's actions to turn around Chubb's standard commercial insurance operations by raising prices and not renewing unprofitable policies were in fact working, but would take longer than expected to benefit Chubb's EPS;

(b) the rate increases in Chubb's standard commercial insurance operations were still growing;

(c) the combined ratio of Chubb's standard commercial insurance business would decline during the balance of 1999; and

(d) the changes in Chubb's standard commercial insurance business would produce an underwriting profit by 2000 and a 6% total return on equity by 2001.

Defendants O'Hare and Kelso repeated this information in private conversations with various analysts, and indicated that Chubb still expected a 1999 EPS of over $4.00 and a 2000 EPS of over $4.50.

In response to these disappointing results, Chubb's stock continued to drop to as low as $58 5/8 on July 30, 1999.

11

Plaintiffs maintain, however, that Chubb's stock traded at artificially inflated levels throughout the remainder of the Class Period because of the Chubb Defendants' refusal to completely disclose the failure of the rate initiative and its financial impact, their use of falsified second quarter 1999 data, and their continued circulation of false and misleading statements. In addition, Plaintiffs aver that Chubb failed to disclose the adverse effects of its integration with Executive Risk.

Chubb's purportedly fraudulent second quarter 1999 statements were included in second quarter Form 10-Q report, filed with the SEC in August 1999. This report stated:

> Premiums from standard commercial insurance, which represent 34% of our total writings, decreased by 6.4% in the first six months of 1999 and 9.1% in the second quarter compared with the similar periods in 1998. The decreases were the result of the strategy we put in place in late 1998 to renew good business at adequate prices and not renew underperforming accounts where we cannot attain price adequacy. On the business that was renewed, rates have increased modestly yet steadily in the first six months of 1999 and we expect this trend to continue. Retention levels were lower in the first six months of 1999 compared with the same period in 1998. Approximately half of the non-renewals were the result of business we chose not to renew and half were the result of customers not accepting the price increases we instituted. It will take at least two renewal cycles to adequately reprice the entire standard commercial book and during that time we will continue to have losses from non-renewal policies. Thus, it will be mid-2000 before these actions have a significant positive effect on our results.

(*Id.* ¶ 74.)

*Close of Class Period: Third Quarter 1999 Results*

On October 15, 1999, the close of the Class Period, Chubb revealed its third quarter 1999 results. Chubb reported a lower-than-forecast EPS of $.40 to $.45 per share, in part caused by losses attributable to Hurricane Floyd.[4] Chubb's reported standard commercial insurance combined ratio increased to 130%. Several analysts, while recognizing the negative impact of Hurricane Floyd on these results, maintained that the poor performance of the standard commercial lines contributed to the earnings shortfall. Chubb's October 15, 1999 press release stated:

> Chubb said its aggressive initiative to reprice standard commercial business and to prune unprofitable accounts continues to meet with success. The average price increase on policies renewed was higher in each successive month of the third quarter, and unprofitable business is not being renewed.
>
> "We are headed in the right direction in fixing the standard commercial business," said Dean O'Hare, chairman and chief executive officer. "However, it will take time for the benefits of the pricing initiative to reverse the losses from underpriced business written in the extremely competitive market of the past few years."

(App. at 538.)

Chubb's 1999 Form 10-K, signed by O'Hare and Schram, provided in part that "[t]he decrease in earnings in 1999 was due to deterioration in underwriting results caused in large part by the continued weakness in the standard commercial classes" and

---

[4]Chubb's press release explained that the third quarter results were down "primarily as a result of catastrophe losses from Hurricane Floyd." (App. at 538.)

that "net premiums from standard commercial insurance decreased 8% in 1999 compared with a 1% decrease in 1998." Moreover, "[i]t will take at least two annual renewal cycles to adequately reprice the entire standard commercial book, and during that time we will continue to have losses from underpriced business. Thus, it will be the latter part of 2000 before our pricing initiative is expected to have a noticeable effect on our standard commercial results." (Compl. ¶ 83.)

*The "True Facts" and Alleged Fraudulent Accounting Practices*

Plaintiffs maintain that Defendants knew that the rate initiative was failing throughout the Class Period, and consequently falsified the first and second quarter 1999 results and issued false statements thereto to effect an artificial inflation of Chubb stock value. Furthermore, Plaintiffs assert that the Chubb Defendants knew at the outset that even if the initiative was ultimately successful, it would not manifest any significant positive impact until at least mid-2000 because "it would take 'at least two annual renewal cycles' for Chubb to reprice the standard commercial lines premiums and after the premiums were repriced it would take another year for the higher premiums to be earned into income." (*Id*. ¶¶ 24(h), 48(h).)

The supposed "true facts" asserted by Plaintiffs can be summarized as follows: (1) Chubb's attempts to raise premiums were causing it to lose profitable business resulting in *increasing* losses in the standard commercial lines because of an extremely competitive market in which the competition was lowering rates;[5] (2) the rate increases that actually were obtained from new and renewal standard commercial insurance policies were too small to compensate for the growing underwriting losses in

---

[5]While the Second Amended Complaint acknowledges that Chubb disclosed that the rate initiative resulted in losses of hundreds of millions of dollars of "good" business, Plaintiffs aver that Chubb lost "additional undisclosed hundreds of millions of dollars in profitable business that Chubb wanted to retain." (Compl. ¶¶ 24(a), 48(a).)

the standard commercial insurance business;[6] (3) Chubb was keeping approximately 60% of its high-risk, unprofitable customers that the rate initiative was supposed to eliminate; (4) it was too soon for the rate initiative to have any significant impact on Chubb's financial results; and (5) the financial results and combined ratio percentages were based on fraudulent accounting.[7]

Plaintiffs charge the Chubb Defendants with deliberately falsifying Chubb's first and second quarter 1999 results by flouting GAAP and SEC rules governing calculation of its earnings for the purposes of concealing the failure of the rate initiative and boosting Chubb's stock. Specifically, Chubb allegedly manipulated reserve levels in its standard commercial and property and marine specialty insurance lines, failed to properly report losses and expenses associated with its standard commercial business, and prematurely recognized revenue for premiums on policies which were not up for renewal until some future point and on policies that had not yet been written. According to Plaintiffs, Chubb's falsified results enabled the Chubb Defendants to render false EPS projections for 1999 and 2000, false combined ratios for the first and second quarter 1999, and false premium growth.

B.

*Procedural History*

Plaintiff California Public Employees' Retirement System ("Calpers") filed a putative class action complaint on August 31,

---

[6]Plaintiffs allege that Chubb was renewing the policies of 50% of its customers either at flat rates or even at reduced premiums to keep these customers.

[7]Plaintiffs assert that the combined ratio of the standard commercial lines reached 130% during the first quarter 1999 and climbed even higher thereafter, far above the 117.9% stated in the first quarter 1999 report and the 120.8% stated in the second quarter report and the further decline forecast by the Chubb Defendants.

15

2000, asserting violations of §§ 10(b), 14, and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, ("1934 Act"), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and §§ 11 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, ("1933 Act"). After appointing the lead plaintiffs and approving their choice of counsel, the District Court granted Plaintiffs leave to file an Amended Class Action Complaint by September 3, 2001. On June 26, 2002, the District Court granted Defendants' motion to dismiss the Amended Complaint, but permitted Plaintiffs leave to file a Second Amended Class Action Complaint. Plaintiffs filed the Second Amended Complaint on August 9, 2002. The District Court dismissed the Second Amended Complaint with prejudice on August 12, 2003.

The gravamen of Plaintiffs' action alleges that Defendants defrauded investors in Chubb and Executive Risk by artificially inflating the value of Chubb's stock with false statements regarding Chubb's standard commercial insurance business for the purpose of effecting a stock-for-stock merger between Chubb and Executive Risk. Plaintiffs aver three causes of action. Count 1 asserts violations of § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder against all Defendants on behalf of purchasers of Chubb stock during the Class Period. Defendants allegedly defrauded purchasers by making materially false and misleading statements regarding the financial condition and future performance of Chubb's standard commercial insurance business. Count II asserts claims under § 11 of the 1933 Act against Defendants Chubb, O'Hare, Schram and Kelso on behalf of shareholders of Executive Risk alleging that the June 17, 1999 Registration Statement filed by Chubb for shares issued to Executive Risk shareholders in the stock-for-stock merger of the companies was false and misleading. Count III, also alleging a cause of action on behalf of Executive Risk shareholders, asserts that the proxy materials provided to Executive Risk shareholders included false and misleading statements in violation of § 14(a) of the 1934 Act, thereby causing the Executive Risk shareholders to approve the merger of the companies.

The Chubb Defendants advanced various arguments in

16

support of their motion to dismiss the Second Amended Complaint. First, that the Second Amended Complaint fails to allege with particularity facts sufficient to demonstrate the falsity of the statements claimed to be false and/or misleading. Second, that Plaintiffs fail to adequately plead scienter. Third, that the statements alleged to be false and/or misleading are not actionable as a matter of law. The Executive Risk Defendants further argued that even if Plaintiffs sufficiently pled causes of action against the Chubb Defendants, the claims nonetheless fail as averred against the Executive Risk Defendants.

The District Court dismissed all Plaintiffs' claims with prejudice. The District Court dismissed Plaintiffs' 1934 Act section 10(b) securities fraud claims, finding that Plaintiffs failed to satisfy the heightened pleading requirements imposed by the PSLRA. Specifically, employing the approach fashioned by the Second Circuit in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000), the District Court found that Plaintiffs failed to plead the falsity of the Defendants' statements and accounting fraud with the requisite particularity, *i.e.* that they failed to plead with particularity the "true facts" purporting to show *how* or *why* those statements are false. In addition, the District Court determined that many of the purported "true facts" are actually consistent with Defendants' public statements throughout the Class Period, implying that these unsupported allegations did not state a claim for relief. Because the District Court determined that the section 10(b) and Rule 10b-5 claims asserted against the Executive Risk Defendants were essentially derivative of the claims asserted against the Chubb Defendants, it dismissed them for a lack of particularity as well. It further noted that Plaintiffs failed to properly allege the falsity of the Executive Risk Defendants' conclusion that the merger was in the best interest of Executive Risk shareholders, even assuming that the value of Chubb's stock was artificially inflated. Given these dispositions, the District Court did not consider Defendants' additional arguments that Plaintiffs failed to plead scienter with sufficient particularity, and that many of the allegedly false statements were nothing more than statutorily protected forward looking statements of optimism. Regarding Plaintiffs' 1933 Act section

17

11 and 1934 Act section 14(a) claims, the District Court determined that those claims "sound in fraud" and thus are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). In accordance with its prior finding that Plaintiffs had failed to plead the falsity of the Defendants' representations with the requisite particularity, the District Court dismissed Plaintiffs' claims under section 11 of the 1933 Act and section 14(a) of the 1934 Act for failure to state a claim. Because control person liability under section 20(a) of the 1934 Act and section 15 of the 1933 Act is premised upon a predicate violation of the 1934 Act and 1933 Act, respectively, those claims were dismissed as well. Finally, the District Court denied Plaintiffs leave to file a Third Amended Complaint because Plaintiffs were already provided ample opportunity to state a cognizable cause of action, and because of undue prejudice to Defendants.

## II.

The District Court properly exercised jurisdiction under 28 U.S.C. § 1331, and 15 U.S.C. §§ 77v, 78aa. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's decision to grant Defendants' motion to dismiss. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). We also exercise plenary review over the District Court's interpretation of the federal securities laws. *Oran v. Stafford*, 226 F.3d 275, 281 n.2 (3d Cir. 2000). In reviewing the dismissal of the Second Amended Complaint, we apply the same standards applied by the District Court.

As Plaintiffs' claims arise under the federal securities laws, we review the relevant standards applicable to motions to dismiss in that particular context. This requires an overview of conventional motion to dismiss standards and how they interact with the appropriate heightened pleading requirements.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and drawing all reasonable factual inferences in favor of the plaintiff, it appears beyond doubt that

18

the plaintiff can prove no set of facts in support of the claim that would warrant relief. *Oran*, 226 F.3d at 279. In making this determination, we need not credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

In the Second Amended Complaint, Plaintiffs allege three separate violations of the federal securities law. Count 1 alleges violations of section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 renders it illegal to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a claim for relief under section 10(b), a plaintiff must plead facts demonstrating that (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). In addition, the claim being asserted must satisfy the heightened pleading requirements of Rule 9(b), *see id.*, and the PSLRA. *In re Rockefeller*, 311 F.3d at 217.

Count III asserts a violation of section 14(a) of the 1934 Act against all Defendants. In pertinent part, section 14(a) states that

> [i]t shall be unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or

19

> appropriate in the public interest or for the
> protection of investors, to solicit . . . any proxy or
> consent or authorization in respect of any security
> (other than an exempted security) registered
> pursuant to Section 781 of the Act.

15 U.S.C. § 78n(a). In contrast to section 10(b) and Rule 10(b)(5), scienter is not a necessary element in alleging a section 14(a) claim. *See Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992). To state a claim under section 14(a), a plaintiff must aver that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *Id*.

Count II alleges that Defendants Chubb, O'Hare, Schram and Kelso violated section 11 of the 1933 Act. Under section 11, any person acquiring a security issued pursuant to a materially false or misleading registration statement may recover damages. *See* 15 U.S.C. § 77k.

Independent of the standard applicable to Rule 12(b)(6) motions, Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This particularity requirement has been rigorously applied in securities fraud cases. *In re Burlington*, 114 F.3d at 1417. As such, plaintiffs asserting securities fraud claims must specify "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller*, 311 F.3d at 216 (quoting *In re Nice Systems, Ltd. Sec. Litig.*, 135 F.Supp.2d 551, 577 (D.N.J. 2001)). Rule 9(b) governs Plaintiffs' 1934 Act claims. As explained below, Rule 9(b) also applies to Plaintiffs' section 11 1933 Act claims,

because those claims are based on averments of fraud. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992) ("[W]e hold that when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies.").

In addition to Rule 9(b), plaintiffs alleging securities fraud pursuant to the 1934 Act must also comply with the heightened pleading requirements of the PSLRA, 15 U.S.C. §§ 78u-4(b)(1), (b)(2). Significantly, the PSLRA "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller*, 311 F.3d at 217. It requires any securities fraud claim brought under the 1934 Act to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.[8]

15 U.S.C. § 78u-4(b)(1). If this requirement is not met, "the court shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). While claims brought pursuant to section 14(a) of the 1934 Act do not require that scienter be pleaded, any claims brought under the 1934 Act must meet the PSLRA particularity requirements quoted above if a plaintiff elects to ground such claims in fraud. *See In re NAHC Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002) (applying PSLRA particularity standards to

---

[8]In addition, with respect to securities fraud claims in which recovery of monetary damages is contingent on proof that the defendant acted with a particular state of mind, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In dismissing the Second Amended Complaint, the District Court did not address whether Plaintiffs' scienter allegations met this heightened burden, instead confining its analysis to the particularity requirement of 15 U.S.C. § 78u-4(b)(1), quoted above.

section 14(a) claims). As fully discussed in this Court's past jurisprudence, in enacting the current version of the PSLRA, "Congress expressly intended" to "substantially heighten" the existing pleading requirements. *In re Rockefeller*, 311 F.3d at 217.

The interplay between Rule 12(b)(6), and Rule 9(b) and the PSLRA is important. Failure to meet the threshold pleading requirements demanded by the latter provisions justifies dismissal apart from Rule 12(b)(6). Accordingly, "unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the Reform Act [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations-- inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." *In re Rockefeller*, 311 F.3d at 224. In other words, pursuant to this "modified" Rule 12(b)(6) analysis, "catch-all" or "blanket" assertions that do not comply with the particularity requirements are disregarded. *See Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001).

III.

A.

*Failure To Plead Fraud With Particularity*

Plaintiffs appeal the Disriict Court's decision to dismiss with prejudice the Second Amended Complaint for failure to allege fraud with particularity.[9] We agree with the District Court

_____

[9]In addition to Plaintiffs' section 10(b) and Rule 10b-5 claims, Plaintiffs' section 14(a) claims must meet the PSLRA particularity requirements because they are grounded in fraud. *See In re NAHC,* 306 F.3d at 1329. Thus, a ruling that the PSLRA particularity requirements have not been satisfied compels dismissal of claims made pursuant to both of these provisions. Similarly, as explicated in part III.B. below, Plaintiffs' section 11 1933 Act claims are grounded in fraud and, for the same reasons discussed here, fail to meet the heightened pleading

22

that the facts alleged by Plaintiffs fail to meet the applicable pleading requirements. Our analysis focuses primarily upon Plaintiffs' "true facts" allegations, which purportedly demonstrate *why* Defendants' various Class Period disclosures and financial results were materially false and misleading. As illustrated below, Plaintiffs' allegations are insufficient to satisfy either Fed. R. Civ. P. 9(b)'s particularity requirement or the PSLRA's information and belief pleading requirement.

Undoubtedly, Plaintiffs identify Defendants' allegedly false and misleading statements with particularity. In addition to requiring plaintiffs to specify each statement alleged to have been misleading, however, the PSLRA directs plaintiffs to specify "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). As such, it is the "true facts" recited in the Second Amended Complaint that are of paramount importance in this inquiry because they provide the exclusive basis for Plaintiffs' claims that the various statements made throughout the Class Period were materially false and misleading, that the first and second quarter 1999 results were falsified, and that Defendants knew of the falsity of the statements and financial results. Accordingly, with respect to the "true facts" allegations, which are pled on information and belief,[10] the PSLRA requires Plaintiffs to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In an effort to meet this pleading burden, Plaintiffs rely primarily on confidential personal sources, as well as an internal memorandum.

This Circuit has not yet addressed the dimensions of the PSLRA's criterion for pleadings made on information and belief. The District Court below elected to follow the moderate interpretation of section 78u-4(b)(1) espoused by the Second

---

requirements of Rule 9(b).

[10]Plaintiffs admit that the allegations comprising the "true facts" are based upon the investigation of counsel, and do not challenge on appeal the District Court's conclusion that such allegations are therefore based on "information and belief."

23

Circuit in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000), and subsequently found persuasive by the First and Fifth Circuits. *See ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351-54 (5th Cir. 2002); *In re Cabletron Systems, Inc.*, 311 F.3d 11, 29-31 (1st Cir. 2002). *See also Fla. State Bd. of Admin v. Green Tree Fin. Corp.*, 270 F.3d 645, 667-68 (8th Cir. 2001).[11] Pursuant to this view:

> [O]ur reading of the PSLRA rejects any notion that confidential sources must be named as a general matter. In our review, notwithstanding the use of the word "all," paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position

---

[11]There may be a circuit split on the appropriate meaning of this provision. The Ninth Circuit's decision in *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 984-85 (9th Cir. 1999), has been cited for the proposition that anonymous sources must be named at the pleading stage to satisfy the heightened pleading requirement for pleading on information and belief. But it is the opinion of the district court in *In re Silicon Graphics* that sets forth a strong per se rule requiring identification of confidential sources. While not entirely clear, the Ninth Circuit's interpretation of the statutory command, which requires plaintiffs to "provide a list of all relevant circumstances in great detail," *id*. at 984, can be read as stopping short of endorsing the district court's per se rule.

occupied by the source would possess the information alleged.

216 F.3d at 314 (emphasis in original).

We join the Second Circuit and adopt this standard as the appropriate standard for courts to employ when assessing the sufficiency of allegations made on information and belief pursuant to 15 U.S.C. § 78u-4(b)(1). We agree with *Novak*'s observation that

[p]aragraph (b)(1) is strangely drafted. Reading "all" literally would produce illogical results that Congress cannot have intended. Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted. Our reading of the provision focuses on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.

216 F.3d at 314 n.1.

Far from commanding that confidential sources be named as a general matter, the PSLRA is silent regarding the sources of a plaintiff's facts. Thus, so long as plaintiffs supply sufficient facts to support their allegations, there is no reason to inflict the obligation of naming confidential sources. Indeed, "[i]mposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them." *Id.* at 314. Accordingly, a complaint can meet the pleading requirement dictated by paragraph (b)(1) by providing sufficient documentary

25

evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs.

The *Novak* approach to assessing the particularity of allegations made on information and belief necessarily entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.

Applying these standards, Plaintiffs' Second Amended Complaint does not meet the PSLRA's particularity standards for allegations made on "information and belief."

*Documentary Source*

We begin by ascertaining whether Plaintiffs' documentary evidence "provide[s] an adequate basis for believing that the defendants' statements [regarding the success of the rate initiative] were false." *Novak* at 314. It does not. Plaintiffs attempt to particularize the allegations regarding the "true facts" with a single internal memorandum. "According to a former property and casualty underwriter for small business accounts in Chubb's Pittsburgh, Pennsylvania branch, and a former vice president of personal lines in Chubb's Warren, New Jersey headquarters, at the end of 1stQ 99 a memo went to the Chubb branch and commercial managers admitting the rate increase/policy non-renewal initiative had not worked and the targeted 10%-15% premium increases had not been achieved." (Compl. ¶ 109.) This is plainly insufficient. Plaintiffs fail to identify who authored the alleged report, when it was authored, who reviewed the report, and what data its conclusions were based upon. The statement that the initiative was a failure is wholly conclusory and lacks data to support it. Buttressing this conclusion of inadequacy is the Second Circuit's post-*Novak* decision in *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, (2d Cir.), *cert. denied sub nom.*, *Scholastic Corp. v. Truncellito*, 534 U.S. 1071 (2001). *Scholastic* instructs that a plaintiff relying on internal reports must "specify the internal

26

reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Id.* at 72-73. The Fifth Circuit in *ABC Arbitrage* found this to be a sensible standard in the context of the PSLRA and Rule 9(b)'s heightened pleading requirements. 291 F.3d at 356. Indeed, the level of detail provided by the plaintiffs in *ABC Arbitrage* in describing the internal reports relied upon in that case stands in stark contrast to what Plaintiffs here furnish. *See id.* at 357. Far from requiring the pleading of detailed evidentiary matter, Plaintiffs' barebones sketch of this internal memo utterly fails to meet this standard in any respect.[12]

*Confidential Sources: General Characteristics*

Plaintiffs' reliance on confidential sources to supply the requisite particularity for their fraud claims thus assumes a heightened importance given the inadequacy of their documentary source. An analysis of the confidential sources cited by Plaintiffs for the purpose of pleading the "true facts" with the requisite statutory particularity reveals, however, that, with few exceptions, they are not "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 313-14.

As a general matter, almost all of the anonymous sources are former Chubb employees. Plaintiffs fail to aver, however, when any of them were employed by Chubb. Nor do Plaintiffs

---

[12]Plaintiffs attempted to add particulars regarding the internal memorandum by submitting a "Notice of Recently Discovered Evidence in Opposition to Motions to Dismiss Second Amended Complaint" to the District Court on December 20, 2002, following the conclusion of briefing and oral argument. Construing this submission as an amendment to Plaintiffs' Second Amended Complaint, the District Court did not consider the submission in its Memorandum and Order dismissing Plaintiffs' Second Amended Complaint, although it noted that consideration of the submission would not have altered its decision. Plaintiffs do not argue that the District Court erred in refusing to entertain the submission. We likewise do not consider it here.

allege the dates that these sources acquired the information they purportedly possess, or how any of these former employees had access to such information. The lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic because, as illustrated below, Plaintiffs heavily rely on former employees who worked in Chubb's local branch offices for information concerning Chubb's business on a national scale. Moreover, many of these sources were branch employees who worked in departments other than standard commercial. Plaintiffs' failure to make these allegations is also significant because we are left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor.

*Confidential Sources: Losing Profitable Customers*

First, Plaintiffs contend that the rate initiative was not working, in part because the rate increases were not sticking and Chubb's standard commercial insurance underwriting losses were increasing. More specifically, the raising of rates in a competitive insurance market caused Chubb to lose "numerous" profitable customers that it wanted to keep. In support of this contention, Plaintiffs cite to:

> A former commercial lines marketing underwriter in Seattle; a former umbrella and excess insurance manager in Englewood, Colorado; an independent insurance broker for A.O.N. Risk Services in Southfield Michigan who did business with Chubb; a former senior customer services team leader in Los Angeles and Seattle who worked in operations supervising employees who entered premiums and claims and coded policies into Chubb's computer system; a former commercial lines customer service representative/rater in Seattle; a former multi-national account specialist in Chubb's Warren, New Jersey headquarters, and a former renewal underwriter in the account service center in Florham Park, New Jersey.

28

(Compl. ¶ 48(a).)

All except one of these sources were employed in branch offices. Only two of the sources appear affiliated with the standard commercial business, and those sources were employed in marketing and customer service capacities. It is not apparent from these brief descriptions that these sources--which noticeably include an insurance broker for another company-- would possess information that the standard commercial business was succeeding or failing on a national level, or that Chubb was losing "numerous" and "profitable" customers nationwide, or whether Chubb expected to retain those customers, and the Second Amended Complaint is devoid of any further explanation. Similarly, it is not intuitively probable that "an independent insurance broker for A.O.N. Risk Services in Southfield Michigan" would know that "independent brokers moved up to 80% of their clients from Chubb to lower-priced insurers." (Compl. ¶ 48(a).)

In the same vein, Plaintiffs cite to low-level, locally sited former employees without alleging how or why such employees would have knowledge that expanded beyond what the vague descriptions suggest to substantiate the claim that, as a general matter, Chubb "lost additional undisclosed hundreds of millions of dollars in profitable business that Chubb wanted to retain." (*Id*.) Plaintiffs rely on a former senior customer services team leader in Los Angeles and Seattle; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan who did business with Chubb; a former energy resources underwriter in the Commercial Lines Department of Chubb & Son, Inc., in Cincinnati and Pittsburgh; a former commercial lines marketing underwriter in Seattle; and a former multi-national account specialist in Chubb's Warren, New Jersey, headquarters. (*Id.*) Plaintiffs do not allege when the employees left Chubb.

It appears, however, that by virtue of their former positions at Chubb, a person in the position of several of the confidential sources Plaintiffs depend upon to support the overall assertion that Chubb was losing good business it wanted

to retain as a result of the rate initiative *may* possess the information alleged.[13] We hesitate to conclude that the *Novak* standard has been met with respect to these sources because Plaintiffs fail to allege when these sources were employed by Chubb, when they obtained the information they allegedly possess, and whether their supposed knowledge is first or second hand.[14] Nevertheless, even if the heightened pleading standards

---

[13]These sources include:

- A former renewal underwriter (who processed renewed policies on established accounts) in Florham Park, New Jersey who alleges that "an independent insurance agency named NIA Insurance Group systematically refused to go along with Chubb's rate increases and moved many customers to other insurers." (Compl. ¶ 48(a).)
- A former commercial lines marketing underwriter for Chubb based in Seattle who claims that "in the states of Washington and Oregon, Chubb lost all of its profitable customers who paid annual premiums of $500,000 to $1 million because of rate increases." (*Id.*)
- A former commercial lines customer service representative/rater for Chubb in Seattle who alleges that Chubb lost Western Wireless, which had provided Chubb with a $400,000-$500,000 annual premium. (*Id.*)
- A former manager of Chubb's customer care unit in Troy, Michigan who alleges that the rate initiative caused Chubb to lose Burger King restaurants in the area, "which represented a large loss to Chubb." (*Id.*)
- A former Chubb underwriting technical assistant in Englewood, Colorado who states that the rate initiative caused Chubb to lose the profitable policy provided to Echo-Star, "as well as four to five other customers with annual premiums equal to Echo-Star's." (*Id.*)
- A former multi-national account specialist for Chubb in its Warren, New Jersey headquarters who claims that Chubb "also lost the account of Mary Kay Cosmetics, various large, high-technology firms and a huge multi-national account from Chubb's Washington, D.C. area office because of the rate increase/policy non-renewal initiative." (*Id.*)

[14]A comparison with the allegations held sufficient for pleading on "information and belief" under the PSLRA in *In re Cabletron*, 311

30

have been met with respect to these sources, Plaintiffs' claims fail under Rule 12(b)(6) because the information these sources purportedly possess is not inconsistent with Chubb's allegedly false and misleading statements. This is discussed below.

*Confidential Sources: Renewing at Inadequate, Flat, and Reduced Rates*

Next, Plaintiffs plead on information and belief the proposition that "[t]he rate increases that were, in fact being obtained on new and renewal standard commercial insurance policies were very small and well below the levels necessary to have any materially favorable impact on Chubb's 99 results, or even to lessen the growing underwriting losses in Chubb's standard commercial business." (Compl. ¶ 48(b).) Plaintiffs' reliance on confidential sources in its effort to state this claim with particularity poses many of the same problems listed above. The Second Amended Complaint defers to:

> (a) A former property and casualty and director's and officer's underwriter in the financial institutions section in Chicago ("and . . . other

F.3d at 21, 24, 30-31, is instructive. In that case, the First Circuit noted that Plaintiffs pled that the former Cabletron employees on whom they rely worked at the Company during the Class Period and had personal knowledge of the practices they described. Moreover, the Court of Appeals found that the sources provided specific descriptions of the means through which the alleged fraud occurred, that their consistent accounts reinforced one another, that it was clear from the complaint that the employees were familiar with the activities discussed, that the sources provided an abundant level of detail, and, significantly, that the sources have a strong basis of knowledge for the claims they make. Detailed pleadings regarding the Cabletron's system for inputting returns bolstered the basis of the anonymous sources' knowledge. As is apparent from the discussion thus far and what follows, Plaintiffs here have not pled nearly the level of detail as the plaintiffs in *In re Cabletron*. Conspicuously absent are allegations that would support the anonymous sources' basis of knowledge. In addition, the *Cabletron* plaintiffs also provided adequate supporting documentation. *Id.* at 27, 31-32. Plaintiffs' reliance on *In re Cabletron* is misplaced.

former Chubb employees who provide specific examples as such") for the blanket claim that "[t]o keep the customers that had not already left Chubb for lower-priced insurers, Chubb began to give their remaining customers either no rate increase or much smaller ones than it had planned under the . . . initiative." (*Id.*)

(b) A former underwriting manager for Executive Risk/Chubb in Simsbury Connecticut for the allegation that "Chubb was renewing the policies of 50% of its customers either at flat rates or even at reduced premiums." (*Id.*)

(c) A former underwriting technical assistant in Englewood, Colorado for the allegation that "Chubb was keeping approximately 60% of its high-risk, unprofitable customers that the rate increase/policy non-renewal initiative was purportedly eliminating." (*Id*. ¶ 48(c).)

The Second Amended Complaint fails to explain how local employees who specialize in lines other than standard commercial would have obtained specific nationwide statistics regarding the standard commercial business. Furthermore, it is far from clear how an Executive Risk/Chubb employee would have access to information that Chubb was renewing the policies of half of its customers at flat or reduced rates, given that Executive Risk/Chubb did not exist until the consummation of the merger on July 20, 1999.

Plaintiffs also rely on a former customer service supervisor in Pleasanton, California, a former regional supervisor for Chubb in Denver, Colorado, and a former commercial lines customer service representative/rater in Seattle as the basis for naming specific customers who were not given rate increases regardless of their profitability. According to a former property claims adjuster in Boston, "underwriters had the incentive to resist rate increases because their own compensation was dependent on keeping customers." (*Id.*) Again, with the

*possible* exception of the commercial lines customer service representative, we are left to speculate on a local customer service worker's and regional supervisor's basis of knowing the precise terms of renewal of commercial lines policies between Chubb and the specific customers. Moreover, Plaintiffs failed to plead the dates in which these policies were renewed at flat prices, rendering it impossible to determine the relationship between these policies and the success of the rate initiative.[15] Once again, as explicated in the next section, even if these limited allegations meet the PSLRA's strict requirements for pleading on information and belief, they do not contradict Defendants' Class Period statements.

*Confidential Sources: Renewing Unprofitable Business*

Third, Plaintiffs aver that Chubb "was renewing hundreds of millions of dollars of standard commercial insurance policies at premium levels Chubb knew were unprofitable and thus would adversely impact Chubb's results going forward." (Compl. ¶ 48(c).) In support of this extremely broad assertion, Plaintiffs rely upon a former umbrella and excess insurance manager in Eaglewood, Colorado; a former customer service supervisor in Pleasanton, California; a former underwriting technical assistant in Englewood, Colorado; a former energy resources underwriter in the Commercial Lines Department in Cincinnati and Pittsburgh; and a former property and casualty and director's and officer's underwriter in the financial institutions section in Chicago. According to these sources, although these unnamed unprofitable customers renewed with Chubb and agreed to pay higher premiums, the premiums "were still far too low to make these customers profitable to Chubb because the customers were such bad insurance risks." (*Id.*) Plaintiffs cite only two specific accounts--McDonald's

---

[15]The District Court shrewdly observed that if Plaintiffs claim that customers left as a result of the rate increases during first quarter 1999, and/or claim that policies renewed during that period were renewed at flat rates, this would appear to conflict with Plaintiffs' assertion that the initiative would, in fact, have little effect in 1999 because policies were not up for renewal until January or July 1.

33

Corporation and Langenscheidt Publishing Group--as examples of unprofitable customers whose respective policies were renewed at a flat, and lower rate respectively. Notably, the source of information about the Langenscheidt Publishing Group is a former customer service representative in Washington, D.C. (*Id.*) The use of these sources to satisfy particularity is problematic for the same reasons detailed above.

*Confidential Sources: Timing of Rate Initiative's Impact*

Fourth, Plaintiffs contend that, contrary to Defendants' representations, the rate initiative, even if successful, "would not have any significant positive impact on Chubb's financial results during 99 and, in fact, Chubb's standard commercial insurance problems would continue to very adversely impact Chubb's results throughout most of 99." (Compl. ¶ 48(d).) In an effort to particularize, Plaintiffs cite a "former vice president in *personal lines* insurance" for the proposition that because "a vast majority of Chubb policies" (implicitly including *commercial lines* policies) only came up for renewal a couple times a year, the rate initiative "would take two to three years [to show] significant positive impact." (*Id.*) Again, without more, it is not sufficiently probable that an employee working in personal lines would possess information regarding commercial lines policies and their impact on the rate initiative. Similarly, it is not sufficiently probable that a former commercial lines underwriter in Newport Beach, California, would know that "***almost none*** of the policies [nationwide] renewing on January 1, 1999, were renewed in accordance with the rate increase/policy non-renewal initiative." (*Id.* (emphasis in original).)

*Confidential Sources: Accounting Fraud*

Fifth, Plaintiffs attempt to substantiate claims of accounting fraud by reference to a number of former employees who held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting.

Plaintiffs claim that the first and second quarter 1999

34

combined ratios were grossly overstated as a result of improper accounting practices. In support of their assertion that the first quarter 1999 combined ratio was in fact 130%, and not 117.9% as Defendants represented, Plaintiffs cite only two former employees--a former branch manager in Grand Rapids, Michigan, and a former Chubb commercial lines marketing underwriter in Seattle. This is unquestionably lacking in particularity, as Plaintiffs have not provided any facts indicating any probability that the two branch employees would have access to this type of national statistical information. Nor do Plaintiffs plead the data that was used to arrive at this figure.

Plaintiffs also maintain that the combined ratio was improperly inflated as a result of reserve manipulations occurring in the standard commercial and property and marine lines, contrary to GAAP.[16] Plaintiffs, however, neglect to plead these purported GAAP violations with the requisite particularity. Again, Plaintiffs do not allege enough to support a probability that their sources would possess the information they claim to possess. Plaintiffs rely on a former *general claims adjuster* in Boston and a former *senior customer services team leader* in Los Angeles and Seattle for the proposition that, "upper management pressured *branch managers* to improperly reduce reserves, and ordered *adjusters* to refrain from recording reserves until after the Executive Risk acquisition was complete." (*Id*. ¶ 48(e) (emphasis added).) Plaintiffs refer to this same customer services team leader for the bold assertion that "the *majority* of Chubb's branch offices were manipulating reserves," (*Id.* (emphasis added)) and for the nationwide statistic that "up to 25% of Chubb's reserves were manipulated downward." (*Id*. ¶ 143.) The sole basis provided for this source's knowledge of the latter assertion is that he "worked for Chubb for nearly six years, and was thus very familiar with Chubb and how it operated." (*Id.*) It cannot be disputed that this description is wholly insufficient to demonstrate how a former employee working in a customer service capacity would know that, nationally, 25% of Chubb's reserves were manipulated downward or that the majority of

---

[16]Financial results reported in violation of GAAP are presumptively misleading. *See* 17 C.F.R. § 210.10-01(a).

branch offices nationwide were manipulating reserves. Remarkably, Plaintiffs cite to a former branch manager in West Michigan for the *contrary* speculation that "I guarantee you they [defendants] *padded* loss reserves." (*Id*.) Plaintiffs further attribute the grandiose assertion that the first quarter 1999 results were deliberately falsified to the former customer services team leader in Los Angeles and Seattle. As a result of the accounting fraud, according to a former branch manager in Grand Rapids, "defendants knew . . . that Chubb's forecasts of 5-1/2%-6% premium growth for its standard commercial insurance business during 99 and a falling combined ratio for its standard commercial business were false and could not be obtained" (*Id*. ¶ 48(j).) It is far from clear how a branch manager would have knowledge of what senior Chubb executives knew. Plaintiffs' reliance on other confidential sources to provide the particularity for their claim of reserve manipulations fails for the same reasons.[17]

_____

[17]

- Plaintiffs rely on a "former marketing vice president" for the observation that "reserves can be 'conveniently manipulated' in the insurance industry" and that Chubb therefore must have been "'managing' its reserves to artificially boost its earnings in 99." (Compl. ¶ 143.)
- Plaintiffs attribute the claim that Chubb was "stair stepping" its reserves to a former manager in Florham Park, New Jersey, and a property claims manager in Troy, Michigan. (*Id*. ¶ 144.) Plaintiffs have provided no information which would indicate that these employees had personal knowledge of reserve manipulations in the standard commercial lines.
- According to a former general claims adjuster in Boston, "the reserve freeze was occurring Company-wide." (*Id*. ¶ 145.)
- With respect to Plaintiffs' averments of improper revenue recognition, they cite to the former senior customer services team leader in Seattle and Los Angeles, and a former personal lines underwriter in Chicago for the claim that, in violation of GAAP, "defendants caused Chubb to record the premium for the renewal policy as revenue . . . 90 days before the policy was even up for renewal." (*Id*. ¶ 154.)
- Incredulously, without providing any further description, Plaintiffs attribute to these same former employees the bald assertion that "this conduct occurred throughout the Company,

Plaintiffs fail to identify with particularity any source for their accounting fraud claims that would reasonably have knowledge supporting the allegations that Chubb's financial statements were false. Nor does the Second Amended Complaint identify the data, or source of data, used to arrive at its calculations. Nor do Plaintiffs provide any particulars regarding the amount by which reserves were distorted, or how much revenue was improperly recognized.[18] *See In Re Burlington*, 114 F.3d at 1417-18 ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data."). Plaintiffs' allegations do not suffice.

*Confidential Sources: Duty to Disclose*

Sixth, Plaintiffs contend that Defendants had an obligation to disclose Chubb's disappointing second quarter 1999 results to the Executive Risk shareholders in advance of the merger vote that occurred on July 19, 1999. Defendants' failure to disclose this information, Plaintiffs allege, rendered the statements contained in the Registration and Proxy Statements false and misleading. Plaintiffs fail to allege with any particularity, however, that Defendants knew of the final second quarter 1999 results at the time the merger vote took place. The conclusory assertion that "O'Hare and the other defendants had access to these financial results far in advance of when they were announced, and before the Executive Risk shareholders voted" (Compl. ¶ 126) is patently insufficient, as is the speculation that "[i]f defendants were paying any attention . . . any serious

_____

in all lines of business." (*Id.*)

[18]Again, comparison to the allegations held sufficient in *In re Cabletron* is revealing. Contrary to the lack of allegations in this case, the *Cabletron* plaintiffs pled estimates of the actual amount of improperly recognized revenue. 311 F.3d at 24. The *Cabletron* plaintiffs also provided adequate supporting documentation. *Id.* at 27, 31-32.

problems in the second quarter should have been glaringly apparent to them by the time of the July 19 shareholder vote." *Pls.' Br.* at 34; *see In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999). Plaintiffs' attempt to claim that the release of the second quarter 1999 results just eight days following the vote supports an inference that Defendants' knew of them prior to the vote is unwarranted given the consistency of the timing of this release with the timing of Chubb's prior releases. Plaintiffs' resort to confidential sources to provide the requisite particularity is once again ineffectual.

> According, [sic] to a former Chubb senior vice-president and managing director of surety business, who was based in Chubb's Warren, New Jersey headquarters . . ., Chubb held quarterly meetings, with O'Hare and Kelso present - where the heads of each Chubb business unit gave detailed reports on the status of their business. According to this same [source] . . . *these meetings were held two weeks after the close of each quarter.* As such, because the 2nd Q 99 ended on 6/30/99, the 2Q 99 meeting at Chubb was held on approximately 7/14/99 - *five full days before the merger vote on 7/19/99.* Given that at each of these meetings, according to the same former vice president, the reports presented to O'Hare and Kelso included 'detailed numbers, figures and graphs' analyzing current results of each Chubb business unit, *defendants O'Hare, Kelso and Schram were fully aware that Chubb's 2Q 99 results would be far worse than expected, but defendants purposely withheld disclosing Chubb's worse-than-expected 2ndQ 99 financial results until after Executive Risk's shareholders voted in favor of Chubb's acquisition of Executive Risk* because they feared that announcing these results beforehand would cause the shareholders to vote against the acquisition.

(Compl. ¶ 126 (emphasis in original).)

Plaintiffs do not allege that this former vice president was employed at the appropriate time. Indeed, it appears that he was not, given the conspicuous absence of an allegation regarding whether or not a meeting actually was held on or about July 14, 1999 to discuss the second quarter results. This general allegation says nothing with particularity about whether a meeting was in fact held prior to the Executive Risk shareholder vote, whether any Defendants were in fact present at such a meeting, or whether the second quarter 1999 results were even available at that time.

*Confidential Sources: Rumors and Speculation*

In addition, interspersed throughout the Second Amended Complaint's discussion of the "true facts" are a number of statements that are attributed to no source and are based on nothing more than speculation. Plaintiffs claim particularity on the basis of such statements as:

(a) "It was well known within Chubb that this [renewing policies of unprofitable customers at flat or reduced rates] was occurring throughout the Company because management was pressuring employees to meet certain revenue targets which were impossible to achieve under the rate increase/policy non-renewal initiative, and so the initiative was simply being ignored, not complied with, and/or applied in a haphazard fashion." (*Id*. ¶ 48(c).)

(b) "It was well known within Chubb that the rate increase/policy non-renewal initiative did not have the immediate impact defendants represented it did and would have very little positive effect in 99 . . . ." (*Id*. ¶ 48(d).)

(c) "[R]umors circulated within the Company that Chubb had artificially boosted its reported financial performance with accounting tricks . . . ." (*Id*. ¶ 48(I).)

39

(d) "Chubb's operations employees openly discussed reserve manipulations at Company meetings."

(e) "[I]t was well known within Chubb during the Class period that the rate increase/policy non-renewal initiative was failing." (*Id*. ¶ 48(g).)

Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1).

*Confidential Sources: Summary*

In sum, Plaintiffs repeatedly attribute allegations about the rate initiative in Chubb's commercial lines business to former employees who worked in other business segments, or who did not work for the company at all, without furnishing any explanation as to how such sources would have knowledge regarding an initiative confined to a particular division of the company for which they apparently had no responsibility. Furthermore, Plaintiffs repeatedly attribute specific nationwide information and statistics regarding Chubb's performance to former employees who worked in local branch offices. These sources have not been described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. Consequently, Plaintiffs have failed to plead the falsity of the Defendants' statements and accounting fraud with the particularity demanded by the PSLRA.

The sheer volume of confidential sources cited cannot compensate for these inadequacies. Citing to a large number of varied sources may in some instances help provide particularity, as when the accounts supplied by the sources corroborate and reinforce one another. In this case, however, the underlying prerequisite--that each source is described sufficiently to support the probability that the source possesses the information alleged-- is not met with respect the overwhelming majority of Plaintiffs' sources. Cobbling together a litany of inadequate allegations

does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA. Consequently, Plaintiffs' argument that particularity is established by looking to the "accumulated amount of detail" that their unparticular source allegations provide when considered as a whole is unavailing. *See In re Rockefeller*, 311 F.3d at 224 (rejecting similar argument because "fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity. If, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal under 15 U.S.C. § 78u-(b)(3)(A)") (internal citations omitted). Finally, Plaintiffs charge that, even foregoing its "true facts" allegations and anonymous former employee allegations, they have adequately pled why Defendants' various statements were misleading in accordance with the PSLRA by demonstrating that Defendants' own public statements contradict Defendants' earlier representations, made prior to the July 19, 1999 Executive Risk shareholder vote and merger, that Chubb's standard commercial business was turning around so quickly that it was already contributing to a stronger-than-expected bottom line in the first quarter 1999. As explained in detail below, Plaintiffs distort Defendants' "admissions" by taking Defendants' statements out of context. Moreover, Defendants' public statements do not, in fact, contradict the purportedly false and misleading statements made throughout the Class Period.

*Failure To State A Claim*

Plaintiffs' failure to meet the threshold pleading requirements mandated by Rule 9(b) and PSLRA support dismissal apart from Rule 12(b)(6). Even if the "true facts" were pled with the requisite particularity, however, they fail to demonstrate the falsity of Defendants' allegedly false and misleading Class Period disclosures.

Keeping in mind that Plaintiffs may not benefit from inferences stemming from unparticularized allegations that may have otherwise been warranted under a traditional Rule 12(b)(6)

41

analysis, even assuming that Plaintiffs' confidential source allegations meet their statutory pleading burden, or taking into consideration those meager allegations that arguably meet this standard, anecdotal examples of profitable customers lost or policies renewed at flat or slightly raised rates does not demonstrate that the rate initiative was failing, especially in light of Defendants' Class Period disclosures.[19]  Plaintiffs' argument that Defendants' own disclosures and the confidential source information demonstrate the falsity of Defendants' earlier Class Period representations is utterly without merit, as Plaintiffs repeatedly take Defendants' statements out of context and draw unreasonable inferences.  Indeed, Defendants' supposed "admissions," and the information provided by the confidential sources are, in fact, generally consistent with what Plaintiffs deem were Defendants' false statements and disclosures.

First, in accordance with those confidential source allegations that reference specific customers that Chubb lost as a result of the rate initiative, Defendants fully disclosed before and throughout the Class Period that the initiative was expected to and was indeed causing the loss of profitable business.

(a)  According to Chubb's 1998 Form 10K, "[o]ur priorities for 1999 are to renew good business at adequate prices and not renew underperforming accounts where we cannot attain price adequacy. This aggressive pricing strategy could cause us to lose some business.  Therefore, we expect overall premium growth to be flat in 1999." (App. at 212a.)

(b)  In the April 27, 1999 Earnings Release Conference Call, Chubb stated, "I did say that we'd lost 50% of the business . . . due to the fact that we

---

[19]*Cf. GSC Partners CDO Fund v. Washington*, 368 F.2d 228, 241-42 (3d Cir. 2004) (finding plaintiffs have not adequately alleged that defendants had actual knowledge of the falsity of a particular statement because, *inter alia*, plaintiffs' reliance on one specific example was insufficient to contradict allegedly false assertion).

really didn't want to renew the goddamn business. . . . The other half, that which left us for price, . . . it would have been good business. . . . lost business is accelerating." (*Id.* at 261a.) O'Hare and Schram further stated in this call that Chubb "was, however, prepared to lose $250-$300 million in standard commercial business." (Compl. ¶ 38.)

(c)  The second quarter 1999 Form 10-Q report, which includes Chubb's allegedly fraudulent second quarter 1999 results, reveals, "[r]etention levels were lower in the first six months of 1999 compared with the same period in 1998. Approximately half of the non-renewals were the result of business we chose not to renew and half were the result of customers not accepting the price increases we institute." (*Id.* ¶ 74.)

(d)  Painewebber's July 27, 1999 report on Chubb, which was based upon information provided by O'Hare, Kullas, and Sills in the July 27, 1999 Conference Call and follow-up conversations quotes O'Hare: "[W]e are losing more business than we did in the first quarter and we're writing less new business than we did in the first quarter." (*Id.* ¶ 67.)

Far from suggesting contradiction, that some particular accounts chose not to renew with Chubb, as alleged by various confidential sources, is completely consistent with Chubb's public statements.

Second, with regard to the Second Amended Complaint's illustrations of specific customers where the rate increases were supposedly not "sticking," Plaintiffs ignore Defendants' contemporaneous public statements acknowledging that Chubb's reported price increases were only averages:

(a)  In an April 27, 1999 Bloomberg News Interview, O'Hare emphasized that the expected

43

rate increases are only averages: "I fully expect that [commercial lines price increases will] build rather rapidly to 5-1/2%-6%. Now those are averages . . . ." (App. at 268a.)

(b) The second quarter 1999 Form 10-Q states: "On the business that was renewed, rates have increased modestly yet steadily in the first six months of 1999 and we expect this trend to continue." (Comp. ¶ 74.)

Plaintiffs' assertions that specific policies were renewed at flat or reduced rates does not indicate that the reported *average* rate increases were false.

Third, Plaintiffs' reference to the internal memorandum that allegedly states that "the targeted 10%-15% premium increases had not been achieved" does not support the alleged falsity of any of Defendants' public statements. The Second Amended Complaint contains no allegation that Defendants reported 10% to 15% rate increases to the public, and it simply does not follow that the rate initiative was failing because such rate increases were not achieved. As mentioned above, Chubb projected to the public average premium growth of 5.5% to 6.5% throughout 1999. On appeal, in an effort to show falsity, Plaintiffs theorize that "the nature of Chubb's renewal cycle, with two and three-year policies, to achieve 5-1/2% to 6% premium growth in 1999 would require Chubb to make its targeted increases of 10%-15% on the policies coming up for renewal." *Pls.' Br.* at 47-48. This theory requires acceptance of the unsupported inference that when the memorandum referred to "10%-15% premium increases" it was referring only to rate increases on the particular policies up for renewal, as opposed to the average increase in premiums across all policies, whether up for renewal or not. Given the paucity of allegations describing this memorandum, it is not reasonable to draw this inference.

Fourth, Plaintiffs contend that O'Hare's "admission," made in the July 27, 1999 conference call and included in the second quarter Form 10-Q report, that "[i]t will take at least two

44

renewal cycles to adequately reprice the standard commercial book and during that time we will continue to have losses from non-renewed policies. Thus, . . . it will be mid-2000 before the benefits of these actions significantly flow to the bottom line" (Compl. ¶¶ 25, 64, 67) contradicts his earlier representation made on April 27, 1999, that "[t]his god dam [sic] ship has turned faster than I thought it was going to" i.e., that the rate initiative was exerting a positive impact in the first quarter 1999. Plaintiffs conveniently ignore the remainder of O'Hare's statement, his later statements made during the Class Period, and his qualification that it would be mid-2000 before *significant* effects would be felt. The entirety of O'Hare's statement is as follows: "I think what we're all concerned about, putting it very bluntly, this god damn ship has turned around faster than I thought it was going to. But it is a big ship." He further qualified: "We all know that you can't turn a business of this size around in one quarter, but the signs bode well for the future." (App. at 249a, 263a.) In another April 27, 1999 interview cited by Plaintiffs, O'Hare again emphasized, "it is a big ship and it does take a while to turn." (*Id*. at 267a.) Plaintiffs' attempt to characterize these statements as amounting to a representation that the initiative was already "contributing to a strong bottom line in the first quarter" is not reasonable. Fraud cannot be manufactured from these statements. After the second quarter 1999 results were released, O'Hare explained in a conference call with analysts that "I think the second quarter has brought me back to where I started because really the first half of the year is sort of flowing out exactly as our original models had assumed. The first quarter, as I think I might have said, the ship was turning faster than I thought it was. I would say we are now right on course. I'm not in any way discouraged, but I admit to being somewhat overly optimistic at the end of the first quarter." (*Id*. at 493a-494a.) We have been clear that fraud cannot be inferred merely because "'[a]t one time the firm bathes itself in a favorable light' but 'later the firm discloses that things are less than rosy.'" *In re Advanta*, 180 F.3d at 538 (quoting *DiLeo*, 901 F.2d at 627.) We have long rejected attempts to plead fraud by hindsight.

Neither the adequately pled "true facts" nor Defendants'

45

public statements demonstrate the alleged falsity of Defendants'
Class Period disclosures.[20]

*Individual Executive Risk Defendants*

Plaintiffs' claims against Defendants Sills, Kullas, and
Deutsch arise exclusively under section 10(b) and section 14(a)
of the 1934 Act.[21] Specifically, Plaintiffs contend that the
Executive Risk Defendants' opinion that the merger was "fair"
and "in the best interests" of Executive Risk shareholders was
false when made. This "fairness" opinion was imparted to
Executive Risk shareholders via the Executive Risk Proxy
Statement.

It is significant to note at the outset that while the fraud
allegations in this case focus exclusively on problems associated
with Chubb's standard commercial business, Executive Risk, a
specialty insurance company, is not involved with the standard
commercial insurance business. Plaintiffs aver, however, that the

---

[20]The disclosures made in connection with the release of Chubb's
third quarter 1999 results at the close of the Class Period are also
consistent with representations made throughout the Class Period. For
example, Defendants reiterated that "it will take time for the benefits of
the pricing initiative to reverse the losses from underpriced business"
(App. at 538a) and that "[i]t will take at least two annual renewal cycles
to adequately reprice the entire standard commercial book, and during
that time we will continue to have losses from underpriced business.
Thus, it will be the latter part of 2000 before our pricing initiative is
expected to have a noticeable effect on our standard commercial results"
(*Id.* at 733a). Moreover, it is not reasonable to infer that Chubb's
reported prior combined ratios were fraudulent from the fact that
Chubb's reported combined ratio increased to 130% in the third quarter,
especially in light of the recognized impact of Hurricane Floyd on this
number. Furthermore, such an allegation constitutes an unacceptable
attempt to plead fraud by hindsight.

[21]Plaintiffs also alleged control person liability claims against
Defendants Sills and Kullas pursuant to section 20(a) of the 1934 Act.
The lack of any predicate violation of the Securities Exchange Act of
1934 compels dismissal of control person claims.

individual Executive Risk Defendants must have become aware of the alleged internal fraud at Chubb while conducting due diligence in preparation for the merger. It is further alleged that, in spite of their purported knowledge, these individual Defendants misrepresented the merger as "fair" from a financial point of view and "in the best interests" of Executive Risk shareholders to facilitate a favorable vote, and thereby reap the special benefits and payments accompanying consummation of the merger.[22]

As lodged against the individual Executive Risk Defendants, Plaintiffs' section 10(b) claims must fail. The District Court properly observed that these claims are essentially derivative of the section 10(b) and Rule 10b-5 claims Plaintiffs asserted against the Chubb Defendants. As such, our holding that Plaintiffs' allegations regarding the falsity of Chubb's first and second quarter 1999 results and affirmative statements made thereto do not pass muster under the PSLRA *a fortiori* necessitates dismissal of the claims as leveled against the individual Executive Risk Defendants to the extent they are based on incorporating that same information in the merger proxy materials and in recommending approval of the merger. Likewise, Plaintiffs' sparse allegations regarding *why* the Executive Risk Defendants' position that the merger was in the best interest of and fair to Executive Risk shareholders was false are not sufficiently particularized.[23] Plaintiffs have not offered

[22]The Proxy Statement disclosed all benefits to be received by Defendants Sills, Kullas, and Deutsch upon completion of the merger.

[23]Indeed, the available information suggests that the merger was fair for Executive Risk shareholders. Executive Risk retained Donaldson, Lufkin & Jenrette Securities Corporation and Salomon Smith Barney Incorporated to opine on the fairness of the potential merger with Chubb. Each financial advisor independently reviewed public financial information and information provided by both companies and expressly concluded that the merger was "fair" to Executive Risk shareholders. The Second Amended Complaint does not include any allegation that any of the individual Executive Risk Defendants were reckless in concluding that the valuations furnished by the investment bankers were fair, or that they intentionally issued this

particularized allegations that the value of Chubb's stock was artificially inflated. Nor have Plaintiffs sufficiently particularized how the individual Executive Risk Defendants became aware of Chubb's purportedly false financial results and the supposed failure of Chubb's rate initiative. A vague, conclusory allegation that the individual Executive Risk Defendants must have been aware of Chubb's falsified financials through partaking in due diligence does not suffice. Moreover, Plaintiffs' assertions that Defendants Sills and Kullas made misstatements to securities analysts by participating with Defendant O'Hare in conference calls to securities analysts on July 27, 1999 is not particularized and is baseless in light of the fact that Second Amended Complaint attributes all those July 27, 1999 alleged misstatements exclusively to O'Hare.

The particularity requirements of the PSLRA also govern the allegations surrounding Plaintiffs' section 14(a) claims because they sound in fraud. *See In re NAHC* 306 F.3d at 1329. As discussed in detail above, Plaintiffs' allegations made in connection with the Proxy Statement are insufficiently particularized. Accordingly, the District Court appropriately dismissed these claims as to the Executive Risk Defendants as well.

B.

*Section 11 1933 Act Claims*

Plaintiffs next contest the District Court's dismissal of their section 11 1933 Act claims for failure to meet the particularity requirement of Fed. R. Civ. P. 9(b). The District Court found that Plaintiffs' section 11 allegations "sound in fraud" and accordingly dismissed those allegations for failure to comply with Rule 9(b). Plaintiffs assert that the District Court erred in imposing heightened pleading requirements on claims that do not predicate recovery on a showing of fraud. They also argue that their section 11 claims are in fact strict liability claims that do not "sound in fraud." The question of whether the

conclusion knowing of its falsity.

48

heightened pleading standard articulated in Rule 9(b) applies to claims brought under section 11 of the 1933 Act that sound in fraud is a question of law subject to plenary review. *See Planned Parenthood of Cent. N.J. v. Attorney General of N.J.*, 297 F.3d 253, 259 (3d Cir. 2002). We affirm the District Court.

First, an examination of the factual allegations that support Plaintiffs' section 11 claims establishes that the claims are indisputably immersed in unparticularized allegations of fraud. The one-sentence disavowment of fraud[24] contained within Plaintiffs' section 11 Count--Count II of the Second Amended Complaint--does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings. We noted in *Shapiro* that because "Rule 9(b) refers to 'averments' of fraud," we must "examine the factual allegations that support a particular legal claim." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992).

Such inquiry reveals that a core theory of fraud permeates the entire Second Amended Complaint and underlies all of Plaintiffs' claims. The linchpin of Plaintiffs' action is their allegations that Defendants knowingly and intentionally committed accounting violations, issued a series of false and misleading statements regarding improvements in Chubb's standard commercial insurance business, and omitted critical information that would tend the negate the representations of continued improvement for the purposes of effectuating a stock-for-stock merger between Chubb and Executive Risk, and avoiding a hostile takeover attempt. The Second Amended Complaint is completely devoid of any allegations that Defendants acted negligently. The language Plaintiffs employ within Count II itself further belies their contention that their 1933 Act claims are strict liability claims. Count II of the Second Amended Complaint expressly incorporates by reference all of the preceding allegations, including the sections entitled

---

[24]Paragraph 166 of the Second Amended Complaint states: "Plaintiffs incorporate ¶¶ 1-161. Plaintiffs expressly disclaim any allegations of fraud, knowledge, intent, or scienter."

"sciener and scheme allegations," (Compl. ¶¶ 166, 172-177) and the "true facts" (*Id.* ¶¶ 24, 28). Count II describes the Registration Statement as "false and misleading," (*Id.* ¶ 169), and repeatedly relies upon the "false statements and accounting manipulations detailed herein" as well as the "artificial[] inflat[ion]" of Chubb's stock to support this characterization. (*Id.*) It speaks of Defendants "conceal[ing] key facts from its public disclosures until after the merger closed," and "concealing the continued serious deterioration in Chubb's standard commercial insurance business." (*Id.*) It further describes Defendants' EPS forecasts, premium growth forecasts, and combined ratio predictions as "false when made." (*Id.*) As in *Shapiro*, Plaintiffs' claims "brim[] with references to defendants' intentional and reckless misrepresentation of material facts." *Shapiro*, 964 F.2d at 288.

Second, past precedent from this Circuit makes evident the proposition that section 11 1933 Act claims that are grounded in allegations of fraud are subject to Fed. R. Civ. P. 9(b). This is correct despite that neither fraud, mistake, or negligence is required to plead a prima facie section 11 claim. It does not logically follow from the fact that fraud is not a necessary element of a section 11 claim that a section 11 claim cannot hinge on an allegation of fraud. Rule 9(b) does not discriminate between various allegations of fraud. Instead, it applies to *any* claim that includes "averments of fraud or mistake." Recognizing that neither fraud nor mistake is a necessary element of a cause of action under section 11, we nonetheless held in *Shapiro* that "when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies." 964 F.2d at 288.

Plaintiffs counter that *Shapiro* does not survive passage of the PSLRA in light of Congress' apparently deliberate choice not to impose heightened pleading requirements on claims brought pursuant to the 1933 Act. Plaintiffs' position is tantamount to claiming that Congress implicitly abrogated application of Rule 9(b) in securities suits brought under the 1933 and 1934 Acts. This argument cannot be reconciled with our view that "[a]brogation of a rule of procedure is generally inappropriate in the absence of a direct expression by Congress

50

of its intent to depart from the usual course of trying 'all suits of a civil nature' under the Rules established for that purpose." *Weiss v. Temporary Investment Fund*, 692 F.2d 928, 936 (3d Cir. 1982) (internal citation omitted), *judgment vacated on other grounds*, 465 U.S. 1001 (1984). Moreover, Plaintiffs' argument disregards the fact that Rule 9(b) and the PSLRA impose distinct and independent pleading standards. This Circuit has recognized the continued independent vitality of Rule 9(b) in securities suits. *See Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) ("Both the PSLRA and the Federal Rule of Civil Procedure 9(b) impose heightened pleading requirements on plaintiffs who allege securities fraud."). Significantly, this Court has recently reaffirmed its reasoning in *Shapiro*.[25] *See In re Digital Island*

_____

[25]Other Courts of Appeals to consider the issue both pre and post passage of the PSLRA have also concluded that Rule 9(b) applies to section 11 claims sounding in fraud. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."); *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) (approving district court's reliance on *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994) for proposition that Rule 9(b) is applicable to 1933 Securities Act claims that are grounded in fraud); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996) ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under section 11 when, . . . they are grounded in fraud."); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (plaintiffs "fail[ed] to satisfy this 9(b) standard" applicable to their Securities Act claims sounding in fraud where "their complaint [was] bereft of any [particularity]"); *accord Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("[a]ssuming without deciding" that the approach set out by the Third Circuit in *Shapiro* applies, and holding that "the § 11 claim in the case at bar . . . does not trigger Rule 9(b) scrutiny" because "it is not premised on fraud."); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996) (dictum) ("[I]f a plaintiff were to attempt to establish violations of Sections 11 and 12[a](2) as well as the anti-fraud provisions of the Exchange Act though allegations in a single complaint or a unified course of fraudulent conduct . . . the particularity requirements of Rule 9(b) would probably apply to the Sections 11, 12[a](2), and Rule 10b-5 claims alike."). *But see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) (holding that "the

*Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004) (explicitly relying upon reasoning of *Shapiro* in holding that Rule 9(b) heightened pleading requirements apply to claims brought under the tender offer "best price rule" of the 1934 Act, 15 U.S.C. § 78n(d)(7); 17 C.F.R. § 240.14d-10(a), when those claims are grounded in fraud); *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 n.5 (3d Cir. 2004) ("[C]laims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of Fed. R. Civ. P. 9(b).").

Equally unavailing is Plaintiffs' contention that *Shapiro* cannot be squared with the Supreme Court's subsequent decisions in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993), and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). *Leatherman* and *Swierkiewicz* rejected *judicially* created heightened pleading standards. In the case *sub judice*, we are faced with a straightforward application of a procedural rule.

Finally, Plaintiffs' reliance on *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001), for the notion that the District Court should strip the section 11 claims of their fraudulent elements and construct a claim based on negligence and/or innocent misrepresentation is inapposite. In *Lone Star Ladies*, it was the plaintiffs, not the district court, who, in light of a dismissal under Rule 9(b), submitted an amended complaint that dropped all 1934 Act fraud claims and instead relied solely on non-fraud 1933 Act claims. Indeed, while the Fifth Circuit held that under the circumstances the district court should have allowed the amendment, it made abundantly clear that "a district court is not required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability. It may dismiss." *Id.* at 368. It is not the responsibility of the District Court to serve as Plaintiffs' advocate.

Plaintiffs' entire Second Amended Complaint, including

particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11.").

the section 11 claims, is grounded in allegations of fraud. Plaintiffs' section 11 claims are accordingly subject to Rule 9(b). As detailed exhaustively in the preceding section, Plaintiffs have not met their burden of pleading fraud with particularity. As such, the District Court appropriately dismissed Plaintiffs' section 11 claims.

## C.

### *Leave to Amend*

Finally, Plaintiffs challenge the District Court's refusal to grant them leave to file a Third Amended Complaint. The District Court denied Plaintiffs leave to amend because Plaintiffs had already been given "ample opportunity [three complaints] to state a cognizable cause of action" and "continu[ing] to require defendants to defend the action, and to ultimately incur the effort and expense of a third motion to dismiss after two successful dismissal motions, would clearly constitute undue prejudice to the defendants." (App. at 896.) We review the denial of leave for abuse of discretion. *In re Adams Golf Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004). We hold that the District Court's denial of leave did not constitute an abuse of discretion.

To effectively evaluate the propriety of the District Court's decision to deny Plaintiffs leave to amend their Second Amended Complaint, it is vital to outline the reasons provided by the District Court for dismissing the Amended Complaint, the guidance it provided to Plaintiffs regarding the Amended Complaint's deficiencies, and Plaintiffs' efforts to address the District Court's concerns in its Second Amended Complaint.

The District Court granted Defendants' motion to dismiss the Amended Complaint for failure to meet the particularity standards dictated by Rule 9(b) and the PSLRA, and for failure to state a claim under Rule 12(b)(6). First, the District Court determined that Plaintiffs failed to plead their fraud claims in accordance with the mandates of Rule 9(b) and the PSLRA. Specifically, Plaintiffs neglected to plead with particularity the "who, what, when, and how" of each statement alleged to be

53

false as required by Rule 9(b), and failed to satisfy the strict standard provided by the Second Circuit's decision in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.), *cert.denied*, 531 U.S. 1012 (2000), for pleading 1934 Act fraud claims made upon "information and belief." In addition to Plaintiffs' failure to offer either adequate documentation or any sources who would likely have knowledge of the allegations set forth in the Amended Complaint, the District Court found that Plaintiffs did not plead with particularity the data used to calculate, or simply the source of, financial calculations that further supply the groundwork of Plaintiffs' fraud claims. Next, the District Court held that Plaintiffs' 1933 Act section 11 and 1934 Act section 14(a) claims fall within the purview of the heightened pleading requirements of Rule 9(b) and the PSLRA, respectively. While such claims can be asserted without pleading scienter, they are subject to heightened particularity requirements when plaintiffs nonetheless elect to ground them in fraud. The District Court observed that Plaintiffs' claims here "sound in fraud" and found their attempt to insulate their section 11 and 14(a) counts through a one-sentence disavowal of fraud allegations unavailing. Third, The District Court found that Plaintiffs' scienter allegations were insufficient. Finally, the District Court characterized many of the statements Plaintiffs alleged to be false as inactionable forward looking statements of optimism.

The District Court's decision to dismiss the Amended Complaint thus provided Plaintiffs with a detailed blueprint of how to remedy the defects in their claims. Plaintiffs were effectively instructed to support fraud claim allegations with particularity, either by adequately describing a source that occupied a position such that the source would probably possess the information alleged, and/or providing documentation. Plaintiffs were further admonished to either plead section 11 and section 14(a) claims without averring fraud or to meet the requisite particularity requirements. As illustrated in our analysis above, however, Plaintiffs' Second Amended Complaint utterly failed to comply with the District Court's directives.

An examination of the changes--or lack thereof--instituted between the Amended Complaint and Second Amended

Complaint is illuminating. With respect to those false statement and accounting fraud allegations made on "information and belief," Plaintiffs neglected to supplement the existing allegations of the Amended Complaint with sufficiently particularized confidential source descriptions. Instead, as discussed above, Plaintiffs chose to repeat the same allegations from the Amended Complaint and attach a deluge of vague confidential source allegations. With respect to their section 11 claims, the District Court explicitly informed Plaintiffs of the reasons why their section 11 claims sound in fraud, including that Count II of the Amended Complaint expressly incorporates by reference all prior factual allegations of the complaint, including the "scienter and scheme allegations." Moreover, the District Court cautioned that its assessment "is not altered by plaintiffs' attempt at transforming an action in fraud into a negligence cause of action by adding a boilerplate assertion under counts II and III 'expressly disclaim[ing] any allegations of fraud, knowledge, intent or scienter.'" (App. at 656.) Yet notwithstanding this evident direction, Plaintiffs neglected to make even a single adjustment to the Amended Complaint to avoid having their section 11 claims subjected to Rule 9(b).[26] Instead, Plaintiffs regurgitated the exact same one-sentence disavowal of fraud that the District Court had already rejected as insufficient.

Fed. R. Civ. P. 15(a) provides that leave to amend "shall be freely given" by the court "when justice so requires." We have previously acknowledged and discussed the PSLRA's unique impact of narrowing application of this standard in securities fraud cases. Allowing leave to amend where "'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,'" would frustrate

---

[26]Actually, Count II's incorporation of allegations located elsewhere in the Complaint, including the scienter and scheme allegations, was amended to reflect the paragraph renumbering that occurred as a result of other amendments made to the Amended Complaint.

Congress's objective in enacting this statute of "'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'" *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir. 2004) (quoting *In re NAHC*, 306 F.3d at 1332, 1333). Plaintiffs here have proffered no additional facts that would cure the pleading deficiencies of the Second Amended Complaint.[27] In light of the clear guidance the District Court afforded to Plaintiffs, Plaintiffs' disregard of that advice, and Plaintiffs' failure to propose additional amendments that would remedy the pleading deficiencies of the Second Amended Complaint, the District Court did not abuse its discretion in denying Plaintiffs leave to amend their deficient complaint.

Plaintiffs nonetheless argue that they should at least be permitted to strip their 1933 Act section 11 claims of fraud allegations and replead these claims pursuant to a theory of strict liability or negligence. Ordinarily, leave to amend is granted when a complaint is dismissed on Rule 9(b) particularity grounds alone. *See In re Burlington*, 114 F.3d at 1435. Leave to replead, however, is often properly denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice and futility. *Id.* at 1434. Significant to the District Court's decision to deny leave to amend is the fact that it had set forth in detail the applicable heightened pleading standards and the deficiencies in Plaintiffs' Amended Complaint. Indeed, as described above,

---

[27]Plaintiffs did present the District Court with a new source to provide further detail regarding the alleged internal memo cited in the Second Amended Complaint. The new source, a former underwriter in Chubb's Southern Zone, asserts that Defendant O'Hare was the author of the memo and that the memo merely stated that the targeted 10% to 15% premium increases were not being achieved. While this amendment may resolve some of the particularity concerns regarding the alleged internal memo, it does not address its primary deficiencies, including when the memo was authored, the basis for the opinion contained within, the data upon which that opinion relies, and who, if anyone, reviewed the memo. Although the Second Amended Complaint alleges that this internal memo was sent to branch and commercial managers, the new source is not identified as a branch or commercial manager.

with respect to the section 11 claims, Plaintiffs were explicitly warned to either plead those claims in accordance with Rule 9(b), or strip them of all averments of fraud. Plaintiffs chose at their peril not to heed the District Court's guidance and avail themselves of an opportunity to rectify the deficiencies of the Amended Complaint. Under this scenario, justice does not require that leave to amend be given.[28] *See* Fed. R. Civ. P. 15(a). The reasons provided by the District Court for its decision have been previously recognized as proper grounds for denying leave to amend a complaint, even when the complaint was dismissed for lacking particularized pleadings. *See, e.g., In re NAHC*, 306 F.3d at 1332 (recognizing "undue delay, bad faith, dilatory motive, prejudice, and futility" as proper grounds for denying leave to amend claims dismissed under the PSLRA); *Krantz v. Prudential Invs.*, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."). We recognized the validity of the District Court's reasoning in *In re Burlington Coat Factory* where we stated that "[o]rdinarily where a complaint dismissed on Rule 9(b) . . . grounds alone, leave to amend is granted," but because "the Complaint in this case was plaintiffs' second . . . it is conceivable that the district court could have found undue delay or prejudice to the defendants." 114 F.3d at 1435. We

---

[28]Plaintiffs' contention that the District Court's dismissal with prejudice somehow ran afoul of the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962), is similarly unpersuasive given *Foman*'s holding that

> [i]n the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, *repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment*, futility of amendment, etc. --the leave sought should, as [Rule 15(a)] require[s], be "freely given."

371 U.S. at 182 (emphasis added). In this case, the District Court clearly declared valid reasons for denying leave.

allowed plaintiffs to replead in that case only because "the [district] court made no such determination, and we cannot make that determination on the record before us." *Id.*

The District Court provided Plaintiffs with a detailed roadmap for curing the deficiencies in their claims. Plaintiffs' Second Amended Complaint did not cure these deficiencies. Defendants have already been forced to defend against three complaints. The District Court's decision to prevent Plaintiffs from having yet another chance to revise their complaint was properly within its discretion.

IV.

For the foregoing reasons, the judgment of the District Court entered on August 12, 2003 will be affirmed.

Calpers v. The Chubb Corporation, No. 03-3755.

SLOVITER, Circuit Judge, Dissenting in part.

I join Parts I, II and III.A of the majority's thorough opinion. I can certainly understand why the District Judge, presented with a complaint of 125 pages which, even after amendment, failed to correct the inadequacies previously noted by the court, decided that Plaintiffs should be given no further opportunities to state a claim. I believe, however, that Plaintiffs may have colorable claims under § 11 of the Securities Act and § 14(a) of the Exchange Act and that the dismissal with prejudice as to these specific claims was not in the proper exercise of the court's discretion. Accordingly I respectfully dissent, in part, from Parts III.B and III.C of the majority opinion.

**I.**

On June 17, 1999, Chubb and Executive Risk filed their registration statement and merger proxy pursuant to the proposed merger. The second quarter 1999 closed on June 30, 1999.

Executive Risk shareholders approved the proposed merger on

July 19, 1999.  Only eight days later, on July 27, Chubb released

its second quarter results, which fell short of earnings projections

by four cents per share.  Although this may not appear significant

to a lay person, these results were described by securities analysts

as a "shocking disappointment."[29]

---

[29]Plaintiffs' complaint quotes PaineWebber's July 27, 1999 report as stating:

> [i]n what was perceived as a shocking disappointment, Chubb reported flat premiums for the second quarter with earnings . . . short of the Street consensus . . . . Management dampened its earlier enthusiasm for improving market conditions, which had ratcheted up expectations early in the second quarter. . . . Total standard commercial business shrank 9.0%, more than expected.  The combined ratio remained unacceptably high at 120.8%.  Commercial multiperil results were terrible. . . . Premiums in total were flat rather than up about 5% as expected.

App. at 727 (ellipses in original).

Prudential Securities issued a report on July 27, 1999 stating that the "[s]tandard commercial results were awful. . . . The total standard commercial book reported a combined ratio of 120.8% slightly better than a year ago but deteriorated from the 117.9% reported in the first quarter."  App. at 728 (ellipse in original).

Plaintiffs argue that Defendants had a duty to disclose the disappointing mid-second quarter results in their June 17, 1999 registration statement and merger proxy materials.  Failure to do so allegedly rendered them false and misleading, and gave rise to a private cause of action not only under § 10(b) of the Exchange Act but also under § 14(a) of the same Act and § 11 of the Securities Act.  See, e.g., Herman & MacLean v. Huddleston, 459 U.S. 375, 382-83 (1983) (holding that action under sections 11 and 10(b) may arise from same disclosure).

Despite the fact that averments under § 11 and § 14(a) need not allege scienter, I do not disagree with the majority that these claims as pled were "grounded in fraud" and therefore, subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (PSLRA).  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1329 (3d Cir. 2002); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 288-89 (3d Cir. 1992).  The majority thus applies the same

61

sweeping particularity analysis applicable under the PSLRA and Rule 9(b) to Plaintiffs' § 10(b) claims as it does to Plaintiffs' § 11 and § 14(a) claims. It then concludes that the "'true facts' allegations, which purportedly demonstrate why Defendants' various . . . disclosures . . . were materially false" were not pled by Plaintiffs with the requisite particularity. See Majority typescript op. at 27. Accordingly, the majority affirms the District Court's dismissal under Fed. R. Civ. P. 12(b)(6) and its denial of leave to amend.

While I agree with the majority's decision to dismiss the Second Amended Complaint on particularity grounds, the majority fails to discuss whether Plaintiffs may have colorable claims under § 11 and § 14(a).

## II.

### A Colorable Claim Exists Under § 11 of the Securities Act and § 14(a) of the Exchange Act

It is well established that a statutory duty exists to disclose

all material information in connection with a registered stock offering, proxy solicitation or shareholder vote. Section 11 of the Securities Act provides that a private action for damages may be brought "by any person acquiring such security" if a registration statement, as of its effective date: (1) "contained an untrue statement of material fact"; (2) "omitted to state a material fact required to be stated therein"; or (3) omitted to state a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Liability attaches to, <u>inter alia</u>, all persons who sign the registration statement, including the "issuer, its principal executive officer or officers," and pursuant to § 15 of the Securities Act, every control person of a party liable under § 11. <u>See</u> 15 U.S.C. §§ 77k(a); 78f(a).

Likewise, the Exchange Act's provision governing proxy solicitations, § 14(a)[30], and Rule 14a-9 promulgated pursuant

---

[30]§ 14(a) of the Exchange Act states:

It shall be unlawful for any person, by the use of the

thereto,[31] provide a private cause of action for the solicitation of proxies that contain any materially false or misleading information. <u>See</u> 15 U.S.C. § 78n; 17 C.F.R. § 240.14a-9; <u>see also</u> <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426 (1964).  Section 14(a)

<hr />

> mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title.

15 U.S.C. § 78n(a).

> [31]Rule 14a-9 provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . .

17 C.F.R. § 240.14a-9(a).

liability attaches to all parties who negligently execute a proxy statement, and pursuant to § 20(a) of the Exchange Act, any person "who directly or indirectly, controls any person" who negligently executes a proxy statement. 15 U.S.C. § 78t(a).

Significantly, an action under § 11 or § 14(a) does not require any allegation that a defendant acted with scienter. See Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983); In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 274 n.7 (3d Cir. 2004) ("Section[] 11 . . . [is a] virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter."); Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 777 (3d Cir. 1976) (in imposing negligence standard, we stated "[t]he language of section 14(a) and Rule 14a-9(a) contains no suggestion of a scienter requirement, merely establishing a quality standard for proxy material"). Their "primary purpose . . . is to protect investors by requiring publication of material information

65

thought necessary to allow them to make informed . . . decisions concerning public offerings of securities." Pinter v. Dahl, 486 U.S. 622, 638 (1988); see also Sec. & Exch. Comm'n v. Ralston Purina Co., 346 U.S. 119, 124 (1953); Desaigoudar v. Meyercord, 223 F.3d 1020, 1024 (9th Cir. 2000).

In Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996), superseded by statute on other grounds, the Court of Appeals for the First Circuit held that a legally cognizable claim under § 11 could be made for failure to disclose mid-quarter results in a registration statement, which "indicat[e] some substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties." Id. at 1211. The defendant's registration statement in that case became effective and its stock offering took place "11 days prior to the close of the quarter then in progress, and about three weeks prior to the company's announcement of an unexpectedly negative earnings report for

66

that quarter." Id. at 1199. The court reasoned that the "corporate

issuer in possession of material nonpublic information, must, like

other insiders in the same situation, disclose that information to

its shareholders or refrain from trading with them." Id. at 1203-

04 (internal quotations and citation omitted). Such disclosure is

especially

> crucial in the context of a public offering, where
> investors typically must rely . . . on an offering
> price determined by the issuer and/or the
> underwriters of the offering. . . . Accordingly the
> disclosure requirements associated with a stock
> offering are more stringent than, for example, the
> regular periodic disclosures called for in the
> company's annual Form 10-K or quarterly Form
> 10-Q filings under the Exchange Act.

Id. at 1208 (internal citation omitted).

Shaw rejected "any bright-line rule" as to when mid-

quarter disclosures must be made, stating that in "many

circumstances, the relationship between the nonpublic

information that plaintiffs claim should have been disclosed and

the actual results or events that the undisclosed information

67

supposedly would have presaged will be so attenuated that the undisclosed information may be deemed immaterial as a matter of law." Id. at 1210-11. The situation before us is not one of those instances.

Akin to the factual circumstances in Shaw, Chubb filed its registration statement thirteen days prior to the close of a disappointing second quarter, the results of which, by all accounts, were the product of more than a mere "minor business fluctuation." Id. at 1211. Analysts' reports stated that these results were a "shocking disappointment" and that the "standard commercial results were awful." See supra, note 1. Surely, "there is a substantial likelihood that a reasonable shareholder would consider [such information] important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (defining element of materiality as "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered

68

the 'total mix' of information made available"); see also Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988).

Furthermore, following the First Circuit in Shaw, I see no reason not to accept Plaintiffs' allegations that Chubb was in possession of information concerning the Company's quarter-to-date performance at the time it issued its registration statement. Shaw, 82 F.3d at 1211 (accepting assumption that corporations regularly monitor their financial performance). Thus, at this early pleading stage, I conclude that Plaintiffs may entertain an actionable claim under § 11 of the Securities Act against Defendants Chubb, O'Hare, Schram and Kelso.[32]

For the same reasons, it appears that failure to disclose Chubb's mid-second quarter results in the proxy materials would

_____

[32]See also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 70-71 (2d Cir. 2001) (holding that material decline in sales or earnings is information that must be disclosed); In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 590-91 (D. N.J. 2001) (same); see also Steckman v. Hart Brewing, Inc., 143 F.3d 1293 (9th Cir. 1998) (noting that material mid-quarter "slowdown" in business or orders would need to be disclosed).

be actionable under § 14(a) of the Exchange Act. "Only when the proxy statement fully and fairly furnishes all the objective material facts as to enable a reasonable prudent stockholder to make an informed investment decision is the federal purpose in the securities law served." Mendell v. Greenberg, 927 F.2d 667, 674 (2d Cir. 1991); see TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448 (1976). Furthermore, Rule 14a-9 "specifically requires that solicitation material which has become false or misleading must be corrected by subsequent materials." Gould v. American-Hawaiian S.S. Co., 351 F. Supp. 853, 868 (D. Del. 1972), rev'd and remanded on different grounds, 535 F.2d 761 (3d Cir. 1976). Thus, even assuming that the proxy materials were accurate when initially prepared by Defendants, Rule 14a-9 mandates that they be amended to reflect the disappointing second quarter results at some point prior to the Executive Risk shareholder vote, a vote which incidently occurred nearly three weeks after the second quarter ended.

Although this court has imposed a slightly higher standard of materiality in the § 14(a) and rule 14a-9 context than in the § 11 context,[33] I cannot conclude, as a matter of law, that these non-disclosures were immaterial. Therefore, in my opinion, Plaintiffs also appear to have a facially valid claim under § 14(a) and Rule 14a-9 against all Defendants.

**III.**

Leave to Amend the § 11 and §14(a) Claims Should be Granted

Fed. R. Civ. P. 15 provides that a party may amend its pleading once before a responsive pleading is served, or thereafter "by leave of court or by written consent of the adverse party." Such "leave shall be freely given when justice so requires." Id.

---

[33]See Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 771 (3d Cir. 1976) (holding that "the basic test of materiality in a section 14(a) setting is whether it is probable that a reasonable shareholder would attach importance to the fact falsified, misstated or omitted in determining how to cast his vote on the question involved") (emphasis added).

In affirming the District Court's dismissal of Plaintiffs' Second Amended Complaint with prejudice, the majority implicitly approves the District Court's conclusion that "[i]n the context of securities fraud actions . . . Rule 15 must be viewed more strictly so as not to vitiate the heightened pleading requirements of the Reform Act by providing plaintiffs unlimited opportunities to amend." App. at 895 (citing In re Cybershop.com Sec. Litig., 189 F. Supp. 2d 214, 237 (D. N.J. 2002)).

The tension between the liberal amendment approach of Fed. R. Civ. P. 15 and the strict pleading requirements of the PSLRA has been noted by the courts. Our court seems to have given inconsistent signals. Compare In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1333 (3d Cir. 2002) (stating in dictum that goals of PSLRA "would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again"), with Werner v. Werner, 267 F.3d 288, 297 (3d Cir.

2001) ("we will not add to the strict discovery restrictions in the . . . PSLRA . . . by narrowly construing Rule 15 in this case, even at this late stage in the litigation. Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to the newly discovered Board meeting minutes.").

The same differences also appear in the decisions of other circuit courts. <u>Compare</u> <u>Miller v. Champion Enters., Inc.</u>, 346 F.3d 660, 690-92 (6th Cir. 2003) (stating in dictum that "to prevent harassing strike suits filed the moment a company's stock price falls . . . would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA") (internal quotations and citation omitted), <u>with</u> <u>Morse v. McWhorter</u>, 290 F.3d 795, 800 (6th Cir. 2002) (reasoning that "leave to amend is particularly appropriate where

73

the complaint does not allege fraud with particularity"); see also

Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052

(9th Cir. 2003) (per curiam) ("Adherence to these principles

[governing leave to amend] is especially important in the context

of the PSLRA. . . . In this technical and demanding corner of the

law, the drafting of a cognizable complaint can be a matter of

trial and error.").

We need not resolve the issue raised in the above cases

because Plaintiffs should be able to file an amended complaint

based on § 11 and § 14(a) that, if divorced from any allegations

of fraud, would not be subject to heightened pleading

requirements of the PSLRA. Whereas allowing any further

amendment to Plaintiffs' § 10(b) claims would be an abuse of

discretion because, as the majority states, "Plaintiffs here have

proffered no additional facts that would cure the pleading

deficiencies of [such claims]," see Maj. typescript op. at p. 65,

the same cannot be said for Plaintiffs' § 11 and § 14(a) claims.

74

Stated otherwise, if given leave to amend, these claims may be pled in a manner which would survive a motion to dismiss under Rule 12(b)(6).  See Lone Star Ladies Inv. Club v. Schlotzky's Inc., 238 F.3d 363 (5th Cir. 2001) (holding that district court's dismissal with prejudice of complaint alleging both § 10(b) and § 11 claims was abuse of discretion because plaintiffs had colorable § 11 claim and could plead it in amended complaint, absent any allegation of fraud).

This court has adopted a liberal approach to the amendment of pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities."  Dole Arco Chem. Co., 921 F.2d 484, 487 (3d Cir. 1990).  The Supreme Court's holding in Foman v. Davis, 371 U.S. 178 (1962), is axiomatic:

> [i]n the absence of any apparent or declared reason
> – such as undue delay, bad faith or dilatory motive
> on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed,

75

undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules required "be freely given."

Id. at 182; see also Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).

The majority affirms the District Court's order denying leave to amend the Second Amended Complaint, stating that "with respect to the section 11 claims, Plaintiffs were explicitly warned to either plead those claims in accordance with Rule 9(b), or strip them of all averments of fraud. Plaintiffs chose at their peril not to heed the District Court's guidance and avail themselves of an opportunity to rectify the deficiencies of the Amended Complaint." See Maj. typescript op. at 66-67 (citing Krantz v. Prudential Invs. Fund Mgmt., LLC, 305 F.3d 140, 144 (3d Cir. 2002)).

We have repeatedly held that "prejudice to the non-moving party is the touchstone for the denial of an amendment."

76

Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989) (internal citations and quotations omitted); see also Cornell & Co. v. Occupational Safety & Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978). For purposes of Rule 15, the term prejudice "means undue difficulty in [defending] a lawsuit as a result of a change in tactics or theories on the part of the other party." Deakyne v. Comm'rs of Lewes, 416 F.2d 290, 300 (3d Cir. 1969). In the absence of substantial prejudice, denial instead must be based on "truly undue or unexplained delay . . . or futility of amendment." Lorenz, 1 F.3d at 1414; see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434-35 (3d Cir. 1997).

The District Court concluded that "to require defendants to defend the action, and ultimately to incur the effort and expense of a third motion to dismiss after two successful dismissal motions, would clearly constitute undue prejudice to the defendants." App. at 896.

The District Court's determination that leave to amend would cause undue prejudice was made in connection with the complaint as a whole, which included Plaintiffs' essentially futile § 10(b) claims. If Plaintiffs were given leave to amend to assert only their colorable § 11 and § 14(a) claims, it is difficult to see why Defendants would suffer undue prejudice in being required to respond to a Third Amended Complaint. Defendants have been on notice of such claims since the inception of the present action and thus any amendment would not require them to respond to any novel or unrelated tactics or theories. In fact, elimination of the § 10(b) fraud claims from any future complaint would materially limit the scope and complexity of the present action. While Plaintiffs may have been obtuse, they have not exhibited any showing of bad faith or caused Defendants to suffer undue delay. "Limited delays and the prejudice to a defendant from the pendency of a lawsuit are realities of the system that have to be accepted." See Ash v. Cvetkov, 739 F.2d

78

493, 496 (9th Cir. 1984).

I am not persuaded by the majority's heavy reliance on the fact that Plaintiffs failed to heed the advice of the District Court. We have stated that in complex litigation, the mere fact that a claimant has had several attempts to comply with pleading requirements is not itself a sufficient basis to dismiss a complaint with prejudice. Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 657 n.3 (3d Cir. 2003); accord Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1053 (9th Cir. 2003) (Reinhardt, J., concurring) (noting that "the undeservedly common 'three bites at the apple' cliche . . . too often provides a substitute for reasoned analysis").

This would not be a third effort, although the majority so implies. Plaintiffs' Second Amended Complaint, at issue in this appeal, was only the first attempt at a substantive amendment; the First Amended Complaint was merely a re-filing of the

79

original complaint after the District Court appointed lead Plaintiffs. Thus, Plaintiffs have been given only one opportunity to properly amend their complaint.

Of course, if Plaintiffs were given the opportunity to replead the § 11 and § 14(a) claims, they would need to comply with the requirement that they do so in "a short and plain statement" of the claims. See Fed. R. Civ. P. 8(a)(2). Admittedly, Plaintiffs' counsel has not shown either the ability or disposition to do so. Their brief was as wordy as their complaint. Nonetheless, I would not preclude them the opportunity to assert a possibly meritorious claim because of defects in the pleadings. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1435 (stating that where complaint is dismissed on particularity grounds, leave to amend is ordinarily granted); Shapiro, 964 F.2d at 278; Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986); Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 n.6 (2d Cir. 1985). In my opinion, Plaintiffs should be given a

80

final opportunity to assert their § 11 and § 14(a) claims with instructions to plead such claim absent any allegations of fraud.